**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Roberto PUENTE, Defendant-Appellant.**

No. 87–1037
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Aug. 28, 1987.
Rehearing Denied Sept. 21, 1987.

Mark Stevens, San Antonio, Tex., for defendant-appellant.

Joel M. Gershowitz, Atty., Crim. Div., Appellate Sec., Dept. of Justice, Washington, D.C., and Helen M. Eversberg, Asst. U.S. Atty., Austin, Tex., for plaintiff-appellee.

Before REAVLEY, JOHNSON and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Roberto Puente, Sr., appeals his convictions on four counts of knowingly making a false material declaration to a grand jury in violation of 18 U.S.C. § 1623(a). We affirm.

## I.

Just before midnight on August 25, 1984, the Eagle Pass Police Department received a report of a fire at the Winter Garden Auto Supply Company owned by appellant's family in Eagle Pass, Texas; this fire completely destroyed the building.

In April 1986, Puente testified before a federal grand jury empaneled to investigate possible violations of 18 U.S.C. § 844(i)[1] in connection with this fire. One of the material questions before the grand jury was whether Puente was in Eagle Pass, Texas, on August 25, 1984, between the hours of 9:00 p.m. and 12:00 p.m.

Puente told the grand jury that he was not in Eagle Pass, Texas, at any time between 9:00 p.m. and midnight on August 25, 1984. Puente testified specifically that: (1) he and his family travelled to Monclova, Mexico, in his son's automobile on the morning of August 25, 1984; (2) they did not return to Eagle Pass, Texas, until the early evening of August 26, 1984; and (3) his son's automobile remained with them in Monclova during their stay there.

The government's evidence contradicted these statements. Two witnesses testified that they saw Puente at the entrance of the Winter Garden store at approximately 11:00 p.m. on August 25, 1984. At the same time, these witnesses also observed the automobile that Puente claimed was in Mexico that evening parked near the Winter Garden store.

The government also introduced, over Puente's objection, computer printouts from the Treasury Enforcement Communications System (TECS) indicating that an automobile, with Texas license number "960 EMP," had crossed the border from Mexico into Eagle Pass, Texas, at 11:30 p.m. on August 25, 1984. The parties stipulated that the vehicle bearing this license number belonged to Puente's son.

## II.

Puente raises three issues in this appeal: (1) whether the district court erroneously admitted the TECS computer printouts; (2) whether the district court committed plain error in improperly amending Count IV of the indictment; and (3) whether the district court committed plain error in permitting the prosecutor to make several remarks during closing argument. We address these contentions in order.

---

1. 18 U.S.C. § 844(i) provides, in pertinent part: "Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both ...."

## A.

Puente first contends that the TECS computer printouts establishing that his son's automobile crossed the border from Mexico into Eagle Pass, Texas, at 11:30 p.m. on August 25, 1984, are inadmissible hearsay.

The district court admitted the printouts under the exception to the hearsay rule for public records in Rule 803(8), Fed.R.Evid., or, alternatively, under the exception for business records in Rule 803(6), Fed.R. Evid. We conclude that the district court correctly admitted the printouts as a public record under Rule 803(8) and do not address whether the printouts are also admissible under Rule 803(6).

Rule 803(8) provides an exception to the hearsay rule for: "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel...."

The government's evidence revealed that the computer printouts are generated in the following manner:

The Customs Service requires its employees to record in the TECS system the license plate number of every vehicle coming into the United States from Mexico at the Eagle Pass border checkpoint. As the automobile approaches the checkpoint, a Customs Service official routinely enters the license plate number into the TECS computer; the computer then scans its records to determine whether the vehicle is stolen or associated with other information—such as use in an earlier smuggling attempt—that would suggest special attention by the customs officers. If the computer search reveals no information, the automobile is allowed to proceed through the checkpoint. As the vehicle passes the official operating the TECS computer, that person verifies that the correct license number has been entered in the system by matching the license number on the automobile with that displayed on the computer

screen. All the entries into the TECS system are later stored in a central system and retrieved as needed to prepare statistical reports on such topics as border traffic and vehicle multiple reentry.

The printouts introduced at trial were the results of an archive search for Texas license number "960 EMP" during the time period of August 15, 1984 to September 15, 1984. This search was made shortly before trial on November 18, 1986.

Puente argues that the above facts do not support admission of the TECS printouts under Rule 803(8) for three reasons. First, Puente contends that the license plate numbers were not "observed pursuant to a duty imposed by law as to which matters there was a duty to report...."

We disagree. The Customs Service has set up an elaborate computer system to record the license numbers of all vehicles crossing the United States borders with Mexico and Canada and has directed its officials to enter into the TECS system the license plate numbers of every vehicle arriving from Mexico. The license numbers were observed and recorded by a customs officer in compliance with legitimate agency directives that were adopted to carry out one of its legal responsibilities—protecting our border. The requirement that the duty to observe and report be imposed by law is satisfied.

Puente next argues that the TECS printouts are inadmissible because Rule 803(8)(B) excludes, in criminal cases, "matters observed by police officers and other law enforcement personnel."

Customs Service officials are "law enforcement personnel" within the meaning of Rule 803(8)(B). *United States v. Orozco*, 590 F.2d 789, 793 (9th Cir.), *cert. denied*, 442 U.S. 920, 99 S.Ct. 2845, 61 L.Ed.2d 288 (1979). Thus, a literal application of the rule would exclude this evidence. But, courts have not inflexibly applied this proscription to exclude *all* law enforcement records in criminal cases.

In *United States v. Quezada*, 754 F.2d 1190 (5th Cir.1985), this court held that an Immigration and Naturalization Service

(INS) form indicating that the appellant had been arrested and deported was admissible under Rule 803(8). This form, the I–205, is routinely prepared by INS officials when they execute a warrant of deportation. The court rejected appellant's contention that the law enforcement exception in Rule 803(8)(B) applied to exclude this form. The *Quezada* court stated that the law enforcement exception in Rule 803(8)(B) was leveled at observations by law enforcement officers at the scene of a crime or in the course of investigating a crime. The court reasoned, however, that this exception does not apply to "documents recording routine, objective observations, made as a part of the everyday function of the preparing official or agency...." *Id.* at 1194. Because the official preparing the form at issue in *Quezada* had no motivation to do anything other than "mechanically register an unambiguous factual matter," the court found the document reliable and not excluded by the law enforcement provision of Rule 803(8)(B). *Id.*

The Ninth Circuit in *United States v. Orozco*, 590 F.2d at 793, has squarely addressed Puente's contention. *Orozco* held that TECS computer cards, virtually identical to the printouts at issue in this case, were admissible as public records under Rule 803(8)(B). The *Orozco* court, based on reasoning similar to that set forth in *Quezada*, rejected appellant's contention that the law enforcement provision in Rule 803(8)(B) applied to exclude the TECS computer cards.

The reasoning of *Quezada* and *Orozco* applies to the instant case. The Customs Service officials who enter the license numbers of vehicles crossing the border into the TECS system have no motivation other than to "mechanically register" this "unambiguous factual matter." *Quezada*, 754 F.2d at 1194. We therefore reject Puente's contention that the TECS printouts are inadmissible under Rule 803(8)(B) because they represent matters observed by law enforcement personnel.

Finally, because the archive search reflected in the printouts was not done until shortly before trial, Puente argues that the printouts were prepared for purposes of this litigation and are thus not reliable.

The relevant inquiry under Rule 803(8) is whether the information was *recorded* by a public official as part of a routine procedure in a non-adversarial setting. *See Quezada*, 754 F.2d at 1194. The information concerning the vehicle at issue was recorded by Customs officials in the TECS system under such circumstances. There is no reason to believe that because this information was later retrieved in connection with litigation, it is less reliable than when first recorded.

■ The license number of the Puente vehicle retrieved from the TECS computer reflects a fact routinely observed and recorded as part of the day-to-day operations of the border checkpoint. Thus, the requisites for admission of the evidence under Rule 803(8) were met and the district court did not err by admitting this evidence.

### B.

Count IV of the indictment alleged that when the prosecutor asked Puente if he was "telling this grand jury, under oath, that [he was] *not* in Eagle Pass, Texas, between 9:00 p.m. and midnight Saturday, August 25, 1984," Puente falsely responded: "I am not insisting on it. I am sure that I was in Monclova, Mexico, with my family." (Emphasis added.) At trial, the parties stipulated that Puente did not say the word "not" in the first sentence quoted above and that word was deleted from the portion of the grand jury transcript read to the jury. In its final charge, the district court described Count IV to the jury in a manner that was consistent with the stipulation, *i.e.*, by deleting the word "not." Puente argues that this instruction constituted an impermissible amendment of the indictment amounting to plain error. We reject this contention.

■ The trial court's failure to conform his instructions to the exact language of the indictment requires reversal only if, considering the evidence, the instruction "so modifies the elements of the offense

charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." *United States v. Ylda,* 653 F.2d 912, 914 (5th Cir.1981). Count IV of the indictment alleges in substance that Puente lied to the grand jury when he told them he was in Monclova, Mexico, and not Eagle Pass, Texas, on the evening of August 25, 1984. The jury was instructed that the government charged Puente with falsely making this representation to the grand jury. Thus, Puente has not demonstrated that he was convicted on a ground other than that charged in the indictment.

Moreover, not only did Puente fail to object to the court's instruction but it was his stipulation that led the court to instruct the jury as it did. Under these circumstances, the trial court's instruction certainly did not amount to plain error.

### C.

During cross-examination of one of the government's chief witnesses, Rose Gonsales, Puente's defense counsel suggested, apparently without factual foundation, that Ms. Gonsales had been fired by Puente for theft from his laundromat. During closing argument, Puente's counsel admitted that he erred by suggesting that Ms. Gonsales had been fired for stealing. In rebuttal, the prosecutor made the following remark:

> Ms. Gonsales was on the stand and she was interrogated about being fired for theft. Now remember that, folks, this lawyer gets up here and with his words, in front of you, people she doesn't know, in front of this court of law then accuses of her of theft, and then he gets up here today and she's gone, and he apologizes because he was wrong. Now that's what he did folks. That was what he did in an effort to try and discredit this lady who was testifying against his client. And I call it reprehensible. You call it what you want to.

Puente contends that the district court committed plain error by allowing the prosecutor to make this comment.

■ We will reverse on the basis of the prosecutor's comments only if those comments, taken as a whole and in the context of the entire case, result in substantial prejudice to the accused. *United States v. Okenfuss,* 632 F.2d 483, 485 (5th Cir.1980). We are persuaded that this single comment, although arguably improper as a personal attack on opposing counsel, did not substantially prejudice Puente's rights.

### III.

We find no error; accordingly, the judgment of the district court is affirmed.

AFFIRMED.