United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 8, 2005**

Charles R. Fulbruge III
Clerk

REVISED OCTOBER 11, 2005

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 04-30633
_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

ELEUTERIO LOPEZ-MORENO, also known as Eleuterio Lopez

Defendant - Appellant

_____

Appeal from the United States District Court
for the Western District of Louisiana

_____


Before KING, Chief Judge, and BARKSDALE and STEWART, Circuit
Judges.

KING, Chief Judge:

Defendant-Appellant Eleuterio Lopez-Moreno was convicted of
transporting undocumented aliens in furtherance of their illegal
presence in the United States. 8 U.S.C. §§ 1324(a)(1)(A)(ii),
1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(i) (2000). He now
appeals the district court's decision to: (1) deny his motion to
suppress evidence against him; (2) deny his motion in limine
challenging the admission of documents contained in the
passengers' A-files; and (3) deny his motion for acquittal based

- 1 -

on the insufficiency of the evidence against him.  We AFFIRM.

## I.  BACKGROUND

**A.  Factual Background**

<u>1.  Preliminary Matters</u>

On the morning of August 21, 2003, Earlton John Parker, a police officer with the Greenwood Police Department in Greenwood, Louisiana, was on a routine traffic patrol.  At 2:36 a.m., Officer Parker pulled over a white van because neither of its side brake lights was functioning.  Only the van's center window brake light was operating.[1]  Officer Parker testified in court that he believed the non-functioning brake lights violated LA. REV. STAT. ANN. § 32:306A (West 2002), which in 2003 required all motor vehicles registered and operating in Louisiana to have at least two functioning brake lights.  Before he initiated the stop, Officer Parker turned on the dashboard-mounted camera in his police cruiser.  The entire stop was thus videotaped (with sound).  Before pulling over the van, Officer Parker also called in the van's Texas license plate number to the police dispatcher.

The van that Officer Parker pulled over was owned by Faustino Martinez, the proprietor of El Cadete Autotransportes ("El Cadete").  El Cadete is what is known colloquially in parts

___

[1]     Lopez-Moreno claims that only the left-side brake light was not operating on the morning of August 21, and that the district court clearly erred in finding otherwise.  We consider this issue below.

- 2 -

of the South Texas Hispanic community as a <u>camioneta</u>. <u>Camionetas</u> are van services that provide point-to-point transportation within the United States and to destinations in Mexico. On the morning in question, the van was driven by Lopez-Moreno, a Mexican citizen and lawful permanent resident of the United States. He had left Houston a few hours earlier with nine passengers who were destined for Atlanta and other locations on the East Coast.

## 2.   Events Before the Warrant Check Came Back Clean

As soon as Lopez-Moreno pulled over, Officer Parker requested his driver's license. Officer Parker then explained that he had pulled over the van because of problems with the brake lights. Officer Parker next proceeded to ask Lopez-Moreno various questions about the nature of his trip. Officer Parker first asked Lopez-Moreno about his destination. Lopez-Moreno told him that he was going to Atlanta. Officer Parker next asked him who he worked for, to which Lopez-Moreno responded that he worked for the company named on the door of the van. Officer Parker then started questioning Lopez-Moreno about the passengers, including how many there were, who they were, and where they were from. Lopez-Moreno was not certain how many passengers there were and did not know their names, but he told Officer Parker that they were from various places.

With these questions asked, Officer Parker began questioning Lopez-Moreno about the immigration status of his passengers.

When asked by Officer Parker if they were present legally in the United States, Lopez-Moreno told him "I guess, I don't know," and "I just work for the company." At that point, Officer Parker again asked Lopez-Moreno where he was taking the passengers. Lopez-Moreno told Officer Parker that he was taking the passengers to various destinations. Parker then asked if they were being taken to work. Lopez-Moreno said that they were going to work at their destinations. Based on these responses, Parker stated to Lopez-Moreno, "Some of them probably ain't legal." Although not readily discernible on the videotape, Officer Parker has testified that Lopez-Moreno responded by saying either "might" or "might be."

At 2:40 a.m., Officer Parker went back to his police cruiser to request a backup officer. He also called in Lopez-Moreno's driver's license number to run a check on his license and to see if he had any outstanding warrants. He then went back and continued to question Lopez-Moreno about the details of his trip. While this next round of questioning was proceeding, the dispatcher radioed back to Parker at 2:43 a.m. to tell him that the driver's license was valid and that she was still checking to see if Lopez-Moreno had any outstanding warrants.

After the dispatcher radioed back, Officer Parker asked Lopez-Moreno about the immigration status of the passengers for either the third or fourth time. Officer Parker stated: "None of them are legal. Be honest with me." This time, rather than

- 4 -

offer a verbal response, Lopez-Moreno shrugged. In response to the shrug, Parker stated "probably not." Lopez-Moreno then volunteered to go back to the van and retrieve the passenger manifest.

At 2:44 a.m., while Lopez-Moreno was going back to the van, the dispatcher called back and told Parker that there were no outstanding warrants. Parker told the dispatcher to hold onto Lopez-Moreno's information.

3. Events After the Warrant Check Came Back Clean

When Lopez-Moreno returned from the van, he went over the manifest with Officer Parker to ascertain how many passengers were in the van. They determined that there were nine passengers. This conversation was interrupted at 2:48 a.m., when the backup officer arrived.

Once the backup officer arrived, Officer Parker called United States Bureau of Immigration and Customs Enforcement ("BICE") Special Agent Craig Griffin. Agent Griffin was the Resident Agent in Charge of BICE's Texarkana, Arkansas office. Agent Griffin had earlier requested the Greenwood Police Department to call them if they suspected that they had undocumented aliens at a traffic stop. Parker explained to Agent Griffin that he had pulled over the van and that Lopez-Moreno was paid to drive the passengers to various destinations. Because of a bad connection, Agent Griffin said that he would call back in a few minutes. While Officer Parker was waiting for Agent Griffin

- 5 -

to call him back, he can be heard speaking with the other officer about an earlier episode when Officer Parker had participated in a traffic stop of a van of undocumented aliens. He mentioned that the driver of the van in that previous stop had been arrested for transporting illegal aliens. At 2:54 a.m., Agent Griffin called back. Officer Parker again explained the circumstances. While Officer Parker had Agent Griffin on the phone, he handed the phone over to Lopez-Moreno and Agent Griffin spoke briefly with Lopez-Moreno. Agent Griffin asked a few questions, including where Lopez-Moreno was born, where the passengers were from, and what immigration documentation he had on him. Lopez-Moreno told him that he was born in Tampico, Mexico, he did not know where the passengers were from, and he did not have any immigration documents. Based on his conversation with Lopez-Moreno, as well as what Officer Parker had told him, Agent Griffin told Officer Parker to detain Lopez-Moreno and the passengers until he could arrive from about an hour away.

When Agent Griffin arrived on the scene, he first interviewed Lopez-Moreno and then interviewed the passengers. Lopez-Moreno again stated that he was from Mexico. However, at this point he produced a resident alien card, i.e., a green card. Griffin then spoke with the passengers. Because neither Officer Parker nor his backup officer spoke Spanish, Agent Griffin was the first law enforcement officer actually to interact with the

passengers.  Agent Griffin asked them their names, their place of birth, their country of citizenship, their date and place of entry into the United States, the status of their entry, and their current place of residence.  Based on their responses to his questions and the other circumstances he observed, Agent Griffin suspected that they were not present legally in the United States.  As a result of Agent Griffin's investigation, his interview with Lopez-Moreno, and the passengers' responses, Agent Griffin arrested Lopez-Moreno for suspicion of transporting undocumented aliens.  Officer Parker issued him a ticket for failing to comply with Louisiana's brake lights statute, LA. REV. STAT. ANN. § 32:306A, and for failing to have a vehicle registration slip, in violation of LA. REV. STAT. ANN. § 47:506 (West 2002).[2]  BICE also detained the van's passengers on suspicion of being present in the United States illegally.

## B.   Procedural Background

On August 27, 2003, a federal grand jury issued a nine-count indictment against Lopez-Moreno charging him with transporting undocumented aliens and with conspiracy to transport said aliens, in furtherance of their illegal presence in the United States and for commercial advantage knowing that they were illegally present, or in reckless disregard of the fact that they were

---

[2]    At some point after the warrant check came back clean, Officer Parker discovered that Lopez-Moreno did not have the van's registration with him.

illegally present, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(i).  The nine counts corresponded to each of the nine passengers in the van.

Immediately after his arraignment on August 27, Lopez-Moreno made several oral motions.  In the first motion, Lopez-Moreno's attorney stated: "I would ask that the Court maintain in custody the [passengers] until I have had a time, a chance to question these people, take their depositions if need be."  The court did not act on the motion but, on the understanding that the passengers would be in custody for some time before being deported, directed Lopez-Moreno's attorney to confer with the Assistant United States Attorney about the logistics of visiting and deposing the passengers.  In response, the Government stated: "[W]e have not asked for material witness warrants on these individuals.  They are presently in the Miller County jail in Arkansas."  Lopez-Moreno's attorney then stated: "I would at least like to know that for the next week they will be maintained in the Miller County jail.  After that amount of time, if I discover it is no longer necessary to have them detained and I am satisfied . . . that we have no fear in letting them be released, then I can certainly so advise the Court . . . ."  In the end, the court directed the Government "to do everything that you can to make sure that [the defense is] notified before the individuals named in the indictment are moved from Miller County jail."  On October 3, 2003, seven of the passengers were

deported.  Although Lopez-Moreno's attorney knew their location up to that point, she made no attempt to depose them.  The eighth passenger was a minor and was staying with a family member pending his deportation hearing.[3]  The ninth passenger was released on an immigration bond but failed to appear at her deportation hearing.  She was ordered deported in absentia.

On September 12, 2003, Lopez-Moreno filed a motion to suppress all the evidence against him on the grounds that his brake lights were working on the morning of August 21, and thus there was no basis for the initial stop.  On October 22, 2003, Lopez-Moreno filed a supplemental motion to suppress, in which he argued that even if the brake lights were not working, the evidence should still be suppressed because: (1) the stop was without legal justification, since the statute that formed the basis of Officer Parker's stop applied only to vehicles registered in the State of Louisiana; (2) Officer Parker had no authority to enforce immigration laws; (3) Lopez-Moreno was not given his Miranda warning until after the BICE agents arrived on the scene; and (4) Lopez-Moreno did not consent to the detention until after the BICE agents arrived on the scene.

On February 11, 2004, a federal magistrate judge issued a report and recommendation on the motion to suppress, which recommended denial of the motion in all respects.  The magistrate

---

[3]  As of the time of trial, the juvenile had not yet been deported.

- 9 -

judge found that the inapplicability of the Louisiana brake light statute was irrelevant because at the time the stop began, Officer Parker had no way of knowing that the van was registered in Texas. The magistrate judge concluded that <u>Miranda</u> warnings were not required because an officer may ask a few questions as part of a traffic stop without first arresting a motorist. The magistrate judge also found that Lopez-Moreno's claim as to Officer Parker's authority to enforce immigration laws did not survive a simple reading of the relevant federal statutes. Finally, the magistrate judge stated that Lopez-Moreno's consent was unnecessary because Officer Parker had a reasonable basis to suspect that immigration laws had been broken. On February 23, 2004, the district court accepted the magistrate judge's recommendation and denied the motion to suppress.

On February 23, 2004, the Government indicated its intent to present certain documents drawn from each of the passengers' "A-files" as evidence at trial. An A-file is the Government's official file on each alien for whom it has information. The Government acknowledged that the A-files contained sworn statements from the passengers, but the Government was explicit that it had no intention of introducing the statements into evidence. The same day, Lopez-Moreno filed a motion in limine arguing that the court should not admit any documents drawn from the A-files. Lopez-Moreno claimed that "the use of such documents (which are clearly hearsay) to prove the alienage

element of the crime violates his rights to Due Process under the Fifth Amendment, as well as his Right to Confrontation as set forth in the Sixth Amendment . . . ."

On February 24, 2004, immediately before the trial started, the court heard oral arguments on Lopez-Moreno's motion in limine. In court, Lopez-Moreno's attorney reiterated the arguments made in the motion and memorandum. His attorney stated: "I filed this motion in limine to ask the Court to deny the Government's use of the A-files, as well as any of the other documents that are incorporated into the A-files which might have been previously executed or created by the government agents." In response, the Government acknowledged that the A-files contained certain documents such as witness statements and interview notes, but it again stated that it would not introduce them at trial. The court ruled that the A-files were admissible, with the exception that the admissibility of any documents containing inculpatory statements by the passengers would be addressed later if the Government sought to introduce them.

Later that same day, February 24, Lopez-Moreno's trial began. The Government's chief witnesses against Lopez-Moreno were Officer Parker and Agent Griffin. At trial, Lopez-Moreno had a standing objection against the introduction of any materials from the A-files. With one exception, each time a document from an A-file was introduced, Lopez-Moreno objected on the grounds stated in the motion in limine, i.e., that

introduction of documents from the A-files violated the rule against hearsay and his right to confront the witnesses against him. The district court overruled the standing objection each time it was made.

On February 25, the Government rested, and Lopez-Moreno made an oral motion for a judgment of acquittal, which the district court denied. On February 26, the jury began its deliberations, and the next day it returned a guilty verdict on all counts. On March 5, 2004, Lopez-Moreno filed a written motion for judgment of acquittal or, in the alternative, a new trial based on his allegation that the prosecution failed to offer admissible evidence that could support a finding of guilt beyond a reasonable doubt. In this motion, he largely restated the arguments made in his motion in limine. On June 4, 2004, the motion for acquittal was denied. On June 10, 2004, Lopez-Moreno was sentenced to eighteen months imprisonment, followed by two years of supervised release.

On June 24, 2004, Lopez-Moreno filed the instant appeal. On appeal, Lopez-Moreno argues that the district court committed reversible error in denying his motion to suppress because: (1) the traffic stop was illegal from its inception; (2) even if the stop was initially valid, Officer Parker illegally expanded the scope of the detention; and (3) the stop was an instance of "ethnic profiling" and thus violated Lopez-Moreno's right to equal protection under the law. Additionally, Lopez-Moreno

argues that the district court improperly denied his motion in limine of February 24, 2004 (stating that documents from the A-files should not be admitted at trial) and improperly denied his motion for acquittal based on the insufficiency of the evidence.

## II.   ANALYSIS

## A.   The Fourth Amendment Motion to Suppress

<u>1.   Standard of Review</u>

In reviewing a district court's denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo.  <u>United States v. Hicks</u>, 389 F.3d 514, 526 (5th Cir. 2004).  In reviewing findings of fact, we view the evidence in the light most favorable to the party prevailing below, which in this case is the Government.  <u>United States v. Shelton</u>, 337 F.3d 529, 532 (5th Cir. 2003).  If this review leads us to the "definite and firm conviction that a mistake has been committed[,]" then the district court's factual finding must be deemed clearly erroneous.  <u>Payne v. United States</u>, 289 F.3d 377, 381 (5th Cir. 2002).  Also, the trial court's determination that the facts provided reasonable suspicion or probable cause is reviewed de novo.  <u>Ornelas v. United States</u>, 517 U.S. 690, 699 (1996).  However, in carrying out this de novo review, we must "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."  <u>Id.</u>

<u>2.   Doctrinal Framework for Analyzing Suppression Claims Related</u>

to Traffic Stops

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. CONST. amend. IV. Traffic stops are deemed seizures for the purposes of the Fourth Amendment. United States v. Valadez, 267 F.3d 395, 397 (5th Cir. 2001). The legality of a traffic stop is analyzed under the framework articulated in Terry v. Ohio, 392 U.S. 1 (1968). See Knowles v. Iowa, 525 U.S. 113, 117 (1998); Berkemer v. McCarty, 468 U.S. 420, 439 (1984). Under the two-part Terry reasonable suspicion inquiry, we ask whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20.

a.    The First Prong of the *Terry* Test

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. See United States v. Breeland, 53 F.3d 100, 102 (5th Cir. 1995). The Supreme Court has stated that in making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). We

- 14 -

have stated previously that reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. See, e.g., United States v. Santiago, 310 F.3d 336, 340 (5th Cir. 2002). In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. Arvizu, 534 U.S. at 274. In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. Terry, 392 U.S. at 27. It is also clear, however, that reasonable suspicion need not rise to the level of probable cause. Arvizu, 534 U.S. at 274.

b. The Second Prong of the *Terry* Test

As for the second prong of the Terry inquiry, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop . . . ." United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004) (en banc). In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. Id. at 507-08. An officer may also ask the driver about the purpose and itinerary of his trip. Id. at 508. Indeed, the officer's questions need not even be related to the purpose of the traffic stop, since "[d]etention, not questioning, is the evil at which

- 15 -

*Terry*'s second prong is aimed." Id. (quoting United States v.

Shabazz, 993 F.2d 431, 436 (5th Cir. 1993)).

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention. Brigham, 382 F.3d at 510; see also Santiago, 310 F.3d at 341-42; United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000); United States v. Dortch, 199 F.3d 193, 200 (5th Cir. 1999). A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. See Brigham, 382 F.3d at 507; United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003).

3.   Application of the First Prong of the *Terry* Test

In the instant case, Lopez-Moreno claims that the first prong of the Terry test was not met since the stop was unjustified at its inception. The Government contends that the van's non-functioning brake lights furnished Officer Parker with two objectively reasonable bases for the initial stop.

The Government first claims that the non-functioning brake lights provided Officer Parker a reasonable basis to believe that Lopez-Moreno was violating LA. REV. STAT. ANN. § 32:306A. At the time of the traffic stop, this statute mandated that "[n]o person

shall . . . operate on the highways of this state any motor vehicle <u>registered in this state</u> . . . unless it is equipped with at least two stop lamps . . . ."  LA. REV. STAT. ANN. § 32:306A (emphasis added).[4]

The Government also contends that the non-functioning brake lights provided Officer Parker with a reasonable basis to believe that Lopez-Moreno was violating LA. REV. STAT. ANN. § 32:53A (West 2002).  This statute states: "No person shall drive . . . on any highway of this state, at any time, any vehicle or combination of vehicles which is in such unsafe condition as to endanger any person or property . . . ."  LA. REV. STAT. ANN. § 32:53A.  The Government claims that the most direct route from Greenwood to Atlanta would have required Lopez-Moreno to spend at least three more hours driving on Louisiana highways.  The Government contends that by doing this driving in the dark without functioning brake lights, the van posed a danger.  Lopez-Moreno offers two arguments in reply.  First, he claims that § 32:53A cannot be used to justify the stop because it was not Officer Parker's true motivation.  Second, he claims that the district court committed clear error in finding that two, rather than one, of the brake lights were not working.  With two of the three brake lights working, Lopez-Moreno claims that the van did not

_____

[4]     In 2004, the phrase "registered in this state" was deleted from the statute.  <u>See</u> LA. REV. STAT. ANN. § 32:306A (West 2002 & Supp. 2005).

pose a danger.

We find that § 32:53A serves as an objectively reasonable justification for initiating the stop. For this reason, we do not reach the issue of whether § 32:306A also justifies the stop.[5] As an initial matter, we find that it was objectively reasonable for a police officer to suspect that the two non-functioning brake lights posed a danger to people and property. Especially considering that the van was a larger-than-normal vehicle traveling in the dark at highway speeds, the lack of functioning brake lights could be seen as increasing the risk of collision from behind. As for Lopez-Moreno's contention that only one brake light was not operating, we have reviewed the videotape of the arrest at length. Based on our review, we find that the district court's conclusion that both side brake lights were non-functioning was not clearly erroneous. Thus, had Officer Parker initially cited § 32:53A as the reason for the stop, the stop unquestionably would have been permissible.

We are now left with Lopez-Moreno's contention that § 32:53A may not serve as a post hoc rationalization for the stop. Supreme Court and Fifth Circuit precedent has made clear that an officer's subjective intentions have no impact on analyzing reasonable suspicion or probable cause because they are both

_____

[5]    See generally United States v. Lopez-Valdez, 178 F.3d 282, 289 (5th Cir. 1999); United States v. Whaley, 781 F.2d 417, 421 (5th Cir. 1986).

- 18 -

considered to be based on an objective test.  More than twenty-five years ago, the Court stated: "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."  Scott v. United States, 436 U.S. 128, 138 (1978).

More recently, the Court again has made clear that an officer's subjective motivations are irrelevant in determining whether his or her conduct violated the Fourth Amendment. Devenpeck v. Alford, 125 S. Ct. 588, 594 (2004) ("Our cases make clear that an arresting officer's state of mind . . . is irrelevant to the existence of probable cause.  [H]is subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." (internal citation omitted));  Whren v. United States, 517 U.S. 806, 813 (1996) ("We think these cases [citing, inter alia, Scott] foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved.").

Most clearly on point is our own prior statement that "[s]o long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes

- 19 -

of the Fourth Amendment . . . ." Goodwin v. Johnson, 132 F.3d 162, 173 (1997) (citing Whren, 517 U.S. at 806).

Based on this line of precedent, we conclude that even if Officer Parker's subjective motivation for initiating the stop was his mistaken view that Lopez-Moreno was violating § 32:306A, the fact that it was objectively reasonable to suspect that Lopez-Moreno was violating § 32:53A means that the initial stop passes constitutional muster.

4. Application of the Second Prong of the *Terry* Test

Lopez-Moreno argues that, assuming the initial stop was valid, the evidence against him nevertheless must be suppressed because Officer Parker unconstitutionally prolonged the stop. He claims that at the time the warrant check came back clean, Officer Parker had no reasonable suspicion that the passengers were undocumented aliens. According to Lopez-Moreno, it was only after the stop was improperly prolonged that any inculpatory evidence was obtained. The Government contends that several factors created reasonable suspicion to justify Lopez-Moreno's continued detention after the warrant check came back negative. First, the Government notes that in the months preceding August 21, 2003, there were several traffic stops in Greenwood that led to the detention of vans of undocumented aliens. The Government makes particular note of the fact that approximately one month prior to Lopez-Moreno's stop, Officer Parker had participated in a stop of a van containing suspected illegal immigrants. Second,

- 20 -

the Government highlights the fact that Lopez-Moreno did not know the names of his passengers. Third, Lopez-Moreno answered "might" when asked whether his passengers were present in the United States illegally. Finally, when asked the same question again, Lopez-Moreno shrugged, which, according to the Government, indicated either agreement with Officer Parker or evasiveness.

We consider each of these factors in turn, mindful of the proper nature of our review. We must consider whether these factors constitute specific and articulable facts which, when considered along with whatever reasonable inferences may be drawn from them, would allow a reasonable person to suspect that Lopez-Moreno was engaging in illegal activity. We must pay heed to the Supreme Court's admonition not to treat each factor in isolation, but rather to give due regard to the totality of the circumstances. Arvizu, 534 U.S. at 274. Additionally, in drawing inferences from these facts, we must give due weight to the inferences drawn by both the trial court and law enforcement officers. Id. at 273; Ornelas, 517 U.S. 699.

It is clear that based on his prior experience, as soon as Officer Parker saw that the van in question--the same type of van as was involved in the earlier undocumented alien traffic stop-- was full of passengers and was being driven by a Hispanic immigrant, his suspicion was piqued. Also, the BICE agents' standing request for the Greenwood Police to call them if they had a traffic stop involving suspected undocumented aliens

- 21 -

reflects that Officer Parker could have inferred that the prior stop in which he took part was not an isolated incident. Certainly, these considerations alone would not have provided reasonable suspicion. Any of the other factors the Government cites, taken on their own, also would not provide reasonable suspicion. However, when all of the factors are viewed in conjunction, we find that there was reasonable suspicion.

The fact that Lopez-Moreno did not know his passengers' names and was not certain whether he had eight or nine passengers was consistent with the view that Lopez-Moreno was not a commercial driver offering a completely legitimate service. Especially considering that Officer Parker already had reason to believe that vehicles full of undocumented aliens were passing through Greenwood, Lopez-Moreno's concession that the passengers might be present in the United States illegally clearly supported the inference that they were, in fact, undocumented aliens. Finally, Lopez-Moreno's shrug, which Officer Parker reasonably interpreted to reflect agreement with his statement that none of the passengers were legal, provided further reason to suspect the passengers' alienage. Thus, we find that all of these factors, taken together, provided Officer Parker with an objectively reasonable basis to suspect that the passengers were undocumented aliens. For this reason, the second step of the Terry test is met. Accordingly, we conclude that the district court properly denied Lopez-Moreno's Fourth Amendment-based motion to suppress.

**B.    The Fourteenth Amendment Motion to Suppress**

In addition to his Fourth Amendment suppression argument, Lopez-Moreno also argues that the evidence against him should have been suppressed based on Officer Parker's alleged violation of his rights under the Equal Protection Clause of the Fourteenth Amendment.  Lopez-Moreno asserts that both his initial stop and continued detention were instances of ethnic profiling.  Lopez-Moreno argues that such treatment violated his rights under the Fourteenth Amendment and that the proper remedy is suppression. We review this claim under the same standard of review as Lopez-Moreno's Fourth Amendment-based suppression claim.

In considering Lopez-Moreno's claim, we note our prior decision in United States v. Chavez, 281 F.3d 479 (5th Cir. 2002).  In Chavez, we considered the defendant's argument that evidence against him should be suppressed because he was a victim of ethnic profiling.  We stated:

> Neither the Supreme Court nor our Court has ruled that there is a suppression remedy for violations of the Fourteenth Amendment's Equal Protection Clause, and we do not find it necessary to reach that issue here. For even if we assume arguendo that the Fourteenth Amendment does provide such an exclusionary remedy, it is plain that [the Defendant-Appellant] has failed to offer proof of discriminatory purpose, a necessary predicate of an equal protection violation.

Chavez, 281 F.3d at 486-87.  Our earlier statement applies equally well to Lopez-Moreno's claim.  He has offered no evidence showing that Officer Parker's actions were driven by a discriminatory purpose.  Accordingly, Lopez-Moreno's Equal

- 23 -

Protection-based suppression argument fails.

## C.    The Admissibility of Evidence of the Passengers' Legal Status

Lopez-Moreno next argues that the district court erred by denying his motion in limine of February 23, 2004, and by admitting at trial documents from the passengers' A-files.  In his motion in limine, Lopez-Moreno argued that documents contained in the passengers' A-files were not admissible to prove that the passengers were in the United States illegally because their admission would violate the rule against hearsay found in FED. R. EVID. 802 and his Confrontation Clause rights under the Sixth Amendment.  As Lopez-Moreno notes, to convict a defendant of transporting an undocumented alien, the Government must prove that: (1) the defendant transported or moved an alien within the United States; (2) the alien came to, entered, or remained in the United States in violation of the law; (3) the defendant was aware, or in reckless disregard, of the alien's illegal status; and (4) the defendant acted willfully in furtherance of the alien's violation of the law.  8 U.S.C. § 1324(a)(1)(A)(ii) (2000); United States v. Diaz, 936 F.2d 786, 788 (5th Cir. 1991).  According to Lopez-Moreno, documents from the passengers' A-files were inadmissible to prove that the passengers came to, entered, or remained in the United States in violation of the law.

We review the district court's evidentiary decisions for an abuse of discretion.  General Elec. Co. v. Joiner, 522 U.S. 136,

141 (1997); <u>United States v. Wilson</u>, 322 F.3d 353, 359 (5th Cir. 2003).

We note at the outset that the section of Lopez-Moreno's appellate brief dedicated to his evidentiary arguments is essentially a copy of his motion in limine filed on February 23, 2004.[6] Because virtually all of this section of his appellate brief was drafted <u>before</u> the trial occurred, it raises issues that are now moot. Specifically, in his motion in limine, and thus in his appellate brief, Lopez-Moreno argues that documents from the passengers' A-files were inadmissible because they contain personal statements made by the passengers that are hearsay, the admission of which would violate his Sixth Amendment right to confront the passengers at trial. However, no documents containing the passengers' hearsay statements were introduced at trial. The record indicates that documents found in the A-files did contain statements made by the passengers about their legal status. For instance, each of the nine passengers signed affidavits concerning his or her illegal entry into the United States. While the government initially may have intended to introduce these documents to prove the passengers' legal status, it ultimately chose not to do so. Accordingly, because these documents were never introduced at trial, Lopez-Moreno's

---

[6] With a few minor exceptions (e.g., the inclusion of a standard of review), Section II of Lopez-Moreno's appellate brief--the section pertaining to his evidentiary arguments--is a verbatim copy of the motion in limine.

objection to their introduction is moot.[7]

At trial, the Government only introduced three items from the passengers' A-files: (1) the passengers' booking photographs; (2) a photocopy of a Mexican voter identification card that one of the passengers had in his possession; and (3) a computer printout from BICE's computer system for each of the seven passengers who had been deported that showed the date on which he or she was deported to Mexico. Lopez-Moreno's appellate brief does not specifically refer to any of these documents, although he does generally assert that documents contained in the A-files should have been excluded because their introduction would violate the rule against hearsay and his Confrontation Clause rights. After considering this argument as applied to the items from the A-files that were admitted at trial, we conclude that

---

[7] Although no documents containing the passengers' statements were introduced at trial, Agent Griffin did testify at trial that, as part of his investigation, he asked each of the passengers: (1) his name; (2) his date and place of birth; (3) his height and weight; (4) whether he had any scars or marks; (5) whether he was married or single; (6) whether he was from Mexico; (7) the date and place of his entry into the United States; (8) the status of his entry; (9) his nationality; and (10) where he currently resided. While Agent Griffin did not testify as to the passengers' answers, he subsequently testified that, based on his investigation, he believed they were in the United States illegally. Lopez-Moreno does not argue here, and did not argue below, that by listing these questions and then offering this opinion, Agent Griffin effectively introduced the passengers' responses through the back door, possibly in violation of the Confrontation Clause. Counsel's delphic objection referred to her motion in limine, which pertained only to the admissibility of documents from the A-files. A proper objection would have required considerably more development. In any event, we need not decide this issue, which would be res nova in this circuit.

these documents were properly admitted.

First, we need not address the admissibility of the passengers' booking photographs because Lopez-Moreno did not object at trial to their introduction and does not challenge their introduction on appeal.[8]  United States v. Bigler, 817 F.2d 1139, 1140 (5th Cir. 1987) (noting that we generally will not consider issues that are not raised by the litigants on appeal). Second, the admission of the photocopy of the Mexican voter identification card did not violate the rule against hearsay or the Confrontation Clause.  The photocopy of the voter identification card cannot be characterized as hearsay because it is not, and does not contain, an assertion, or nonverbal conduct intended to be an assertion, offered to prove the truth of the matter asserted.  See FED. R. EVID. 801(c) (defining "hearsay" as "a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted").[9]  Likewise, admission of the photocopy of the Mexican voter identification card did not violate the Confrontation Clause.  The Confrontation Clause

---

[8]    At trial, Lopez-Moreno initially objected to the introduction of the photographs on the ground that they had not properly been authenticated.  The Government responded by eliciting testimony designed to authenticate them.  After the Government authenticated the photographs, Lopez-Moreno withdrew his objection to their introduction.

[9]    FED. R. EVID. 801(a) defines a "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion."

states that "[i]n all criminal prosecutions, the accused shall enjoy the right

. . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI.  The applicability of this provision is limited "to 'witnesses' against the accused--in other words, those who 'bear testimony.'"  Crawford v. Washington, 541 U.S. 36, 51 (2004).  As such, the Confrontation Clause applies only to testimonial statements.  Id.  While the Supreme Court chose in Crawford not to define precisely what is and is not a testimonial statement, it is clear that the photocopy of the identification card does not qualify as such because it in no way involves a witness bearing testimony.  See id. at 51, 56.  Accordingly, the district court did not abuse its discretion when it admitted the photocopy of the Mexican voter identification card.

The admission of the computer printouts was also proper. While the computer printouts conceivably could be viewed as containing hearsay statements (statements regarding the passengers' deportations from the United States), they are nevertheless admissible under FED. R. EVID. 803(8), which permits the introduction of public records and reports containing hearsay statements.  FED. R. EVID. 803(8) covers:

> Public records and reports.  Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases,

- 28 -

factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Under Rule 803(8), records, including computer records, made by a public agency are admissible, regardless of whether they would otherwise be excluded as hearsay.  See United States v. Puente, 826 F.2d 1415, 1417-18 (5th Cir. 1987) (holding that under Rule 803(8), computer records maintained by the Customs Service that showed when the appellant's vehicle entered the United States were properly admitted); United States v. Quezada, 754 F.2d 1190, 1193 (5th Cir. 1985) (holding that under Rule 803(8), a record of deportation contained in an INS file was properly admitted); United States v. Koontz, 143 F.3d 408, 412 (8th Cir. 1998) (holding that booking records were properly admitted under Rule 803(8)); United States v. Smith, 973 F.2d 603, 605 (8th Cir. 1992) (holding that computer records of reported robberies in a specified locality were properly admitted under Rule 803(8)).  In Quezada, we rejected the claim that the law enforcement exception in Rule 803(8)(B) applied to exclude a document showing that the appellant had been deported from the United States, stating that Rule 803(8)(B) was directed at observations by law enforcement officers at the scene of a crime or in the course of investigating a crime and did not apply to "recording routine, objective observations, made as part of the everyday function of the preparing official or agency . . . ."  Quezada, 754 F.2d at 1194.  We further stated that because the official preparing the

- 29 -

form at issue in <u>Quezada</u> had no motivation to do anything other than "mechanically register an unambiguous factual matter," the document was reliable and not excluded by the law enforcement provision of Rule 803(8)(B).  <u>Id.</u>  The same reasoning applies in the present case.  BICE's computer records of the passengers' deportations are the type of public records that are admissible under Rule 803(8), and they are not the sort of investigative reports (i.e., police reports) that would be excluded under Rule 803(8)(B).  <u>See</u> FED. R. EVID. 803(8); <u>Quezada</u>, 754 F.2d at 1194; <u>Puente</u>, 826 F.2d at 1417-18.  Accordingly, these computer records were properly admitted under Rule 803(8).  Additionally, the admission of these computer records presents no Confrontation Clause problems.  In <u>Crawford</u>, the Supreme Court stated that business records, which are analogous to public records, are "by their nature . . . not testimonial" and not subject to the requirements of the Confrontation Clause.  <u>Crawford</u>, 541 U.S. at 51, 56; <u>see also</u> <u>id.</u> at 76 (Rehnquist, C.J., concurring in judgment) (noting that "the Court's analysis of 'testimony' excludes at least some hearsay exceptions, such as business records and official records").  Furthermore, this court has found that items in an alien's immigration file akin to business records were non-testimonial in nature and held that the Confrontation Clause did not bar their admission.  <u>See</u> <u>United States v. Rueda-Rivera</u>, 396 F.3d 678, 680 (5th Cir. 2005) (per curiam); <u>United States v. Gutierrez-Gonzales</u>, No. 03-51253, 111

Fed. Appx. 732, 734 (5th Cir. Oct. 8, 2004) (per curiam) (unpublished).  The computer records at issue in the present case are public records of this sort, and, as such, the district court did not abuse its discretion by admitting them into evidence. Accordingly, Lopez-Moreno's argument that inadmissible documents from the A-files were admitted at trial fails.

## D.    The Sufficiency of the Evidence

Finally, Lopez-Moreno claims that insufficient evidence existed to prove that the passengers were in the United States illegally, and he argues that, as a result, the district court improperly denied his motion for acquittal based on the insufficiency of the evidence.  He does not challenge the sufficiency of the evidence proving that he was aware of, or in reckless disregard of, the aliens' illegal status.  When reviewing a challenge to the sufficiency of the evidence, we consider whether the evidence presented, viewed in the light most favorable to the prosecution, would allow any rational finder of fact to conclude that the prosecution proved the elements of the crime beyond a reasonable doubt.  United States v. Valentine, 401 F.3d 609, 615 (5th Cir. 2005); United States v. Brugman, 364 F.3d 613, 615 (5th Cir. 2004).  We review the district court's denial of Lopez-Moreno's motion for acquittal de novo, applying the same standard as did the district court, i.e., whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  Valentine, 401 F.3d at 615.

In the present case, there was compelling evidence that the passengers were in the United States illegally. For instance, the evidence showed, inter alia, that: (1) the passengers were being transported in a camioneta van of the sort often used to transport illegal aliens from Mexico to the United States and from point to point within the United States; (2) none of the passengers spoke English; (3) the passengers' personal hygiene reflected that they had been unable to bathe for quite some time, which (in the opinion of the BICE agent) is typical of illegal aliens in transit for extended periods; (4) none of the passengers in the van had any luggage; (5) one passenger was carrying a Mexican voter identification card; (6) other than the passenger carrying the Mexican voter identification card, none of the nine passengers had any identification; (7) according to Officer Parker, when he stated to Lopez-Moreno that "some of them probably ain't legal," Lopez-Moreno responded by saying either "might" or "might be"; (8) when asked the same question later, Lopez-Moreno's body language indicated to Officer Parker that he either agreed or was being evasive; (9) BICE records introduced at trial showed that seven of the nine passengers subsequently were deported from the United States;[10] and (10) Agent Griffin testified that, based on his investigation, the passengers were

_____

[10] We note that the computer record applicable to each alien shows only the fact of deportation and does not, by itself, evidence the different fact that such alien "has come to, entered, or remains in the United States in violation of law," as required by 8 U.S.C. § 1324(a)(1)(A).

- 32 -

in the country illegally.  While none of these factors alone is definitive proof that the passengers were in the United States illegally, when viewed together in the light most favorable to the prosecution, they would allow a rational finder of fact to conclude that the prosecution proved this element of the offense beyond a reasonable doubt.  See Valentine, 401 F.3d at 615; Brugman, 364 F.3d at 615.  Thus, Lopez-Moreno's sufficiency argument fails, and the district court properly denied his motion for acquittal.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

KING, Chief Judge, specially concurring:

I write separately to note that while Lopez-Moreno challenged the admission of documents from the passengers' A-files, he did not challenge at trial (and does not challenge on appeal) the fact that Agent Griffin, who was not qualified as an expert but rather testified as a lay witness, gave lay opinion testimony regarding the illegal status of the passengers that was explicitly based on his specialized training as a federal immigration agent.

Specifically, at trial, the Government asked Agent Griffin, "[I]n your training as a Border Patrol agent and as an Immigration agent and now an Immigration and Customs Enforcement agent, [did] you make a determination whether or not these passengers are illegal aliens unlawfully in the country?" Agent Griffin responded that he did make such a determination, concluding that all nine passengers were in the United States illegally. In providing this testimony, Agent Griffin was not testifying as an expert witness pursuant to FED. R. EVID. 702, nor was he testifying as a summary witness pursuant to FED. R. EVID. 1006. See FED. R. EVID. 702 & 1006. Rather, Agent Griffin was testifying as a lay witness.

The opinion testimony of a lay witness is governed by FED. R. EVID. 701, which was amended in 2000 to state, inter alia, that such testimony may not be "based on scientific, technical, or

other specialized knowledge within the scope of Rule 702."[11]

Prior to December 1, 2000, FED. R. EVID. 701 did not prohibit lay

opinion testimony based on specialized knowledge.  According to

the advisory committee notes accompanying Rule 701,

> Rule 701 [was] amended [in 2000] to eliminate the risk
> that the reliability requirements set forth in Rule 702
> will be evaded through the simple expedient of proffering
> an expert in lay witness clothing.  Under the amendment,
> a witness' testimony must be scrutinized under the rules
> regulating expert opinion to the extent that the witness
> is providing testimony based on scientific, technical, or
> other specialized knowledge within the scope of Rule 702.
> . . . By channeling testimony that is actually expert
> testimony to Rule 702, the amendment also ensures that a
> party will not evade the expert witness disclosure
> requirements set forth in FED. R. CIV. P. 26 and FED. R.
> CRIM. P. 16 by simply calling an expert witness in the
> guise of a layperson.

FED. R. EVID. 701 advisory committee's note (internal citations

omitted).  In applying the specialized training and experience he

has as a Border Patrol and Customs Enforcement agent to form this

opinion, Agent Griffin came dangerously close to applying

"scientific, technical or other specialized knowledge" that is

beyond the scope of what is known by ordinary laymen.   See Duhon

v. Marceaux, No. 00-31409, 33 Fed. Appx. 703 (5th Cir. Feb. 25,

2002) (per curiam) (unpublished) (finding that police officer's

---

[11]    FED. R. EVID. 701, as amended in 2000, states in full:
If the witness is not testifying as an expert, the
witness' testimony in the form of opinions or inferences
is limited to those opinions or inferences which are (a)
rationally based on the perception of the witness, (b)
helpful to a clear understanding of the witness'
testimony or the determination of a fact in issue, and
(c) not based on scientific, technical, or other
specialized knowledge within the scope of Rule 702.

opinion testimony exceeded the scope of permissible lay opinion testimony under Rule 701); <u>United States v. Garcia</u>, --- F.3d ---, 2005 WL 1444146, at *10-12 (2nd Cir. June 21, 2005) (holding that DEA agent's opinion testimony was not admissible under Rule 701 because it was based on his specialized knowledge as a DEA agent); <u>United States v. Conn</u>, 297 F.3d 548, 553-55 (7th Cir. 2002) (finding that ATF agent's opinion, based on his training and knowledge as an ATF agent, exceeded the scope of admissible lay opinion testimony under Rule 701). <u>See also</u> FED. R. EVID. 803(8).

Lopez-Moreno, however, did not object to the fact that Agent Griffin's opinion testimony exceeded the scope of permissible lay opinion testimony under Rule 701, nor does he raise this issue now on appeal. We have repeatedly stated that we "will not consider issues that are not raised by the litigants on appeal." <u>United States v. Bigler</u>, 817 F.2d 1139, 1140 (5th Cir. 1987); <u>Zuccarello v. Exxon Corp.</u>, 756 F.2d 402, 407-08 (5th Cir. 1985); <u>see also</u> FED. R. APP. P. 28. Accordingly, we need not decide this issue in the present case.

The Government normally attempts to prove the passengers' illegal status in a § 1324 case by calling one or more of them to testify. <u>See also</u> § 1324(d). Had it done so here, it likely would not have perceived a need to introduce Agent Griffin's opinion testimony about the passengers' legal status. Relying on a case agent's lay opinion of their legal status seems to me to

be problematic.