# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**14-943**

PATRICIA PARKER

VERSUS

TOWN OF WOODWORTH, ET AL.

**\*\*\*\*\*\*\*\*\*\***

### APPEAL FROM THE
### NINTH JUDICIAL DISTRICT COURT
### PARISH OF RAPIDES, DOCKET NO. 234,726
### HONORABLE GEORGE C. METOYER, JR., DISTRICT JUDGE
**\*\*\*\*\*\*\*\*\*\***

### SYLVIA R. COOKS
### JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Billy H. Ezell and Phyllis M. Keaty, Judges.

**AFFIRMED.  REMANDED WITH INSTRUCTIONS**.

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

Patricia Parker (Parker) and two of her co-workers, Rufus Smith and Gracie Jackson (Jackson), were travelling to work shortly before 6:00 A.M. on the morning of January 4, 2009, in the Town of Woodworth, Louisiana (Town). The three were employed by the Methodist Conference Center located on a private drive, Methodist Parkway. After turning off of U.S. Highway 165, Parker proceeded on Coulee Crossing Road, a public roadway, for approximately two miles. Officer David R. Godwin (Godwin) of the Woodworth City Police Department began following Parker's pick-up truck proceeding on Coulee Crossing Road with his dash cam video recording Parker's vehicle. Parker was driving within the posted speed limit. When Parker approached Methodist Parkway she engaged her right turn signal light. As she turned onto Methodist Parkway, Godwin immediately engaged the lights on his police unit signaling Parker to pull over. Godwin admitted Parker had not committed any traffic violation but testified he stopped her vehicle solely because "he wanted to see who she was" and "where she was going." Parker recalled Godwin telling her he pulled her over because she and her occupants looked suspicious. Godwin could not recall whether he told Parker that she or her vehicle looked suspicious, and he could not articulate any basis for describing the vehicle or Parker as suspicious. The video introduced at trial shows Godwin had Parker's vehicle on camera well before she turned onto Methodist Parkway. Godwin, however, testified he just happened to be turning onto Methodist Parkway at the same time as Parker. The video also shows Parker was driving normally. Nothing in the video reveals anything "suspicious" about Parker's pick-up truck, the manner in which it was

being operated, or the behavior or appearance of its occupants. The video also shows, just after Godwin stopped Parker's vehicle, another automobile turned onto Methodist Parkway. The driver of that vehicle drove slowly past Godwin and proceeded down the road without Godwin making any attempt to stop that car.

Parker was cooperative at all times during the stop. She immediately explained to Godwin that she and her passengers, all dressed in black and white uniforms, were reporting to work at the Methodist Center for the breakfast shift. When she inquired as to the reason for the stop, Godwin explained he wanted to find out why they were going down that road at such an early hour before daylight. He did not accuse Parker of any traffic violation, driving erratic, or any manner of driving unlawfully. Despite Parker's explanation, Godwin detained Parker and ran a computer check on her driver's license, proof of insurance, and vehicle registration. Parker explained the vehicle was owned by her live-in boyfriend. When Godwin ran a check on Parker's driver's license, the insurance card, and vehicle registration, he was informed via the State of Louisiana computerized system that Parker's driver's license was suspended. When he informed Parker of this information she explained she had paid the necessary fine for a prior driving offense and she in fact possessed a valid driver's license which was not under suspension. She offered to show documents to Godwin to prove she had paid the fines and fees for that offense and that her current license was valid. Godwin would not consider the documents and informed Parker he must rely only upon the State computer's database for information regarding the status of her license. Godwin also informed Parker the registration card she presented was expired. He issued Parker multiple citations including a citation for driving under suspension, unlawful use of a driver's license, operating a vehicle not covered by

2

insurance/security, and for not having a current registration. Godwin testified he issued the additional citation for unlawful use of a driver's license because Parker was driving with a license under suspension. He also explained he issued the citation for driving without insurance/security because it was his understanding that a driver without a valid license could not obtain insurance on a vehicle. This he did despite Parker showing him an insurance card indicating current insurance coverage on the vehicle in the name of its registered owner.

Godwin asked if any of the passengers had a driver's license. He testified he asked this because if they had a license he might allow them to drive the vehicle from the scene. He then testified after he was told both passengers did not have a driver's license he informed Parker he would not allow either of the passengers to drive the vehicle. Parker testified she called her supervisor already working at the Methodist Center and asked her to meet her and bring a licensed driver to drive the pick-up truck to the Methodist Center parking area. The videotape of the encounter confirms Parker's testimony in this regard. Godwin then informed Parker he would not allow *any licensed driver* to drive the truck the short distance down the private road to the Methodist Center because the owner of the vehicle was not present to authorize such an individual to drive the vehicle. Godwin had the truck towed from the private road by a private towing service at a cost of $193.61. There is no evidence in the record that Godwin obtained anyone's permission to tow the vehicle from private property. In addition to this cost, the fines for the traffic citations issued to Parker totaled $1,060.00. The Town of Woodworth ultimately sought to collect over $1,500.00 from Parker.

3

When Parker and the owner of the truck went to retrieve the vehicle they were told a hold had been placed on the vehicle by the Town pending payment of the fines. Parker and the owner of the vehicle visited the local Louisiana State Police Office where they were informed that the hold was not proper. After a State Police officer telephoned a Town official concerning the impropriety of the hold, the owner was allowed to retrieve his vehicle. Parker paid the towing fee so that the owner could recover his vehicle.

Parker attempted to address the matter with the Mayor of Woodworth who is the magistrate judge over such proceedings. The Mayor spoke with Parker in the hallway at City Hall at which time Parker presented him with proof that the vehicle was insured by its owner at the time of the stop and that the owner had a current registration for the vehicle at the time of the stop. She asked for additional time to obtain documents to prove that her license was not under suspension and that she had paid all prior fines and fees on the charge of driving without a license. She was given to February 18, 2009, to provide such proof. **The charge of no registration was dismissed**. Parker returned to see the Mayor on February 18, 2009, and presented documentation showing her license was not, in fact, suspended when she was stopped by Godwin. Documentation from the State of Louisiana shows that **Parker paid her fine for driving without a license on July 18, 2008**. This document was of record with the State at the time Godwin stopped Parker. Parker also presented the Mayor with another document from the Louisiana Department of Public Safety and Corrections, Public Safety Services, dated January 1, 2009, which shows that Parker's ticket for driving without a license had been paid and that she was cleared to receive a new driver's license

4

which she then obtained. Thus, it is clear when Parker was stopped on January 4, 2009, by Godwin, she presented a newly issued, valid driver's license to Godwin. Despite Parker's presentation of documentary evidence to the Mayor, he then asked her how much money she had with her. She responded she only had about $300.00. The Mayor informed her she could at least pay the unlawful use of a driver's license charge that day. Despite Parker's payment of this ticket in the amount of $215.00, as the Mayor demanded, the Town of Woodworth filed a bill of information charging Parker with all four of the charges reflected in the original traffic citations. Parker was charged with driving a vehicle with no insurance despite an acknowledgement in writing on the Bill of Information that proof of insurance on the vehicle was provided but "subject was not covered on [the] policy." She also was charged with having no registration, although this charge had been dismissed and the Mayor had already demanded and accepted payment for the unlawful use of a driver's license charge.

On April 14, 2009, Parker filed suit against Godwin and the Town of Woodworth. On or about June 3, 2009, the Magistrate's Court for the Town of Woodworth issued warrants for the arrest of Patricia Nicole Parker for failure to pay $810.00 on the charge of "driving under suspension or revocation" and for failure to pay $770.00 for "no insurance." On July 20, 2009, the Town and Godwin filed a Motion for Summary Judgment in this litigation which was denied. This court denied writs. On August 31, 2009, pursuant to the warrants issued by the Town, Parker was arrested at her home, with her minor children present, and spent twenty-five (25) days in jail. On May 25, 2011, the trial court granted summary judgment in favor of the Town of Woodworth and Godwin dismissing all of Parker's claims. Parker appealed. This court issued a ruling on Parker's appeal

on March 7, 2012. In that opinion entitled *Parker v. Town of Woodworth, Et Al.,* 11-1275, pp. 2-3 (La.App. 3 Cir. 3/7/12), 86 So.3d 141,142-43 (emphasis added), this court found:

> [H]andwritten notes indicate that the unlawful use charge was paid that day [February 18]. Ms. Parker was given until March 18 to come up with money to pay the remaining two fines.
>
> A typed section on the bill of information stated: "I, *Patricia N. Parker*, do hereby plead guilty to the charge of *415, 4141, 865A, 729ATKT* & Complaint No./c11576-1-2-3-4 and do hereby request an extension to pay no later than the *18th* day of *Feb. 1909* [sic]." A signature line with the initials "PP" and a notary signature line signed by "Dorothy A. Gunter" followed. The "19" in front of the "*1909*" was also scratched through. Ms. Parker admitted that she made the initials "PP" but stated that none of the other handwriting was hers. She also indicated that none of the other handwriting was on the document, including Ms. Gunter's signature, when she filled in the initials "PP." Ms. Parker also stated that she signed her full name off to the side by a handwritten "x" and signature line indicating she had been given an extension to March 18. Ms. Parker went back on March 18 to try and get the other charges dropped, but the Mayor was not there.
>
> **On April 14, 2009, Ms. Parker filed suit against the Town of Woodworth and Officer David Godwin claiming she suffered damages as a result of an illegal stop. Subsequently, on June 3, 2009, she received two notices that warrants had been issued for her arrest. She showed her attorney and was arrested on August 31, 2009. She spent twenty-five days in jail.**

This court reversed the trial court, and remanded the case for further proceedings finding Parker's payment of one fine in the matter did not preclude her from pursuing her claims for false arrest. Additionally, this court found:

> In the present case there has been no conviction. Ms. Parker contends she only paid the fine for unlawful use of a license at the Mayor's insistence. There is no information that Ms. Parker pled guilty under oath or in open court. Her deposition testimony reveals that all information on the bill of information was filled in after she signed it. Furthermore, there is a question as to why Ms. Parker would plead guilty to the "no registration" charge that was dismissed.
> . . . .

6

We also note that none of the citations issued to Ms. Parker were for a moving violation that would give rise to reasonable grounds for the stop.

*Id.* at 144.

No writs were filed. The case proceeded as a bench trial. The trial court rendered judgment in favor of Parker "and against defendants, TOWN OF WOODWORTH, for general damages for all of plaintiff's psychological suffering in the sum of THIRTY THOUSAND AND NO/100 ($30,000.00) DOLLARS, together with legal interest from date of judicial demand until paid in full." The trial court also awarded Parker reimbursement of $193.61 for the towing fee and reimbursement of $215.00 for the fine Parker paid in Docket No. C11576 for unlawful use of a driver's license. All costs were assessed against the Town of Woodworth. The judgment did not specify the amount of costs.

## ANALYSIS

The Town of Woodworth appeals the trial court ruling alleging five assignments of error:

A. The trial court committed a reversible error in failing to view the content of the videotape showing the entire investigatory stop.

B. The trial court erred in finding a lack of evidence to support an investigatory stop of Parker.

C. The trial court's Judgment is in error as it only finds fault as to Woodworth – the employer - and not as to Officer Godwin – the employee, which is necessary for a finding of vicarious liability.

D. The trial court erred in failing to find Officer Godwin is entitled to immunity.

E. The trial court erred in awarding excessive general damages and failing to provide the specificity required in a judgment levying costs against a political subdivision.

7

**The Videotape**

Defendant alleges the trial court erred in failing to view the videotape entered in evidence. After asking Godwin during the course of his testimony if there was a videotape of the incident, defense counsel moved to enter the videotape into evidence. Parker's counsel objected to the introduction of the videotape because he had not been provided a copy in discovery nor had he been informed that Defendants intended to enter it in evidence. The trial court admitted the videotape of the incident over Parker's objection. Parker did not seek review of that ruling. Defense counsel asked no further questions of Godwin and did not play the video for the trial court at that time. At the close of Parker's case, defense counsel moved for an involuntary dismissal. In his argument in support of his motion, defense counsel states "and if you've watched the video it's pretty telling . . . ." The trial court denied Woodworth's motion and the trial proceeded. There was no further mention of the video and no attempt by defense counsel to play the video for the court or to even ask the court whether it viewed the videotape before resting its case.

The trial court is presumed to have considered all of the evidence before it, and Defendant points to nothing but speculation that the court did not view the videotape. Further, we have viewed the videotape and find it supports the trial court's judgment. It does not support the Town's contentions in its brief to this court and the oral argument of its counselor. The videotape clearly shows Godwin had Parker's vehicle on his dash cam well before she turned onto Methodist Parkway or even gave any indication that she would turn onto Methodist Parkway,

8

contrary to his assertions. The Mayor acknowledged during his testimony that Godwin began following Parker on Coulee Crossing Road. This is in direct contradiction to Godwin's testimony. The video also shows Parker was driving in a normal manner and engaged her turn signal light as she approached the turn. The videotape recording also confirms there was nothing "suspicious" about Parker's vehicle, nor its occupants, which might have given Godwin reason to stop Parker. After Godwin stopped Parker's vehicle, another vehicle can be seen in the video passing slowly by Godwin, proceeding down Methodist Parkway, but Godwin made no attempt to stop that vehicle. Perhaps there is much truth to the old adage: "use a picture – it's worth a thousand words." The Town's lawyer is correct in this case, the video is "pretty telling" and says it all. It bolsters the trial court's finding, the previous observations of this court, and the panel's ruling that: "none of the citations issued to Ms. Parker were for a moving violation that would give rise to reasonable grounds for the stop." *Id.* This assignment of error is meritless.

**Investigatory or "Check-em-out" Stop**

In its second assignment of error, the Town of Woodworth asserts: "The trial court erred in finding a lack of evidence to support an investigatory stop of Parker." We review the trial court's findings of fact under the manifest error standard of review. "It is well settled that a court of appeal will ordinarily not set aside a trial court's finding of fact unless it is clearly wrong." *Hebert v. Adcock*, 10-887, p. 3 (La.App. 3 Cir. 2/2/11), 55 So.3d 1007, 1011 "(citing *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978)." "When, as here, the factual findings of the trial court are based on the credibility determinations of the witnesses, great deference must be afforded to the trial court's findings." *Smith v. Guidroz*, 12-1232, p. 15 (La.App. 3 Cir. 10/30/13), 125 So.3d 1268, 1277. "Moreover, where

9

there is conflicting testimony, inferences of fact should not be disturbed upon review even if the reviewing court feels that its own evaluations and inferences are more reasonable. *Stobart v. State through DOTD*, 617 So.2d 880 (La. 1993)." *Id.*

In this case, our review of the record, including the videotape discussed above, shows more than ample support for the trial court's finding that there was no reasonable ground for Godwin to make an "investigatory stop." In his initial testimony when called by Plaintiff on cross-examination, Godwin could not articulate any basis for stopping Parker and detaining her; nor was he able to establish any basis as to why he was justified in stopping Parker's vehicle. On direct examination, in response to defense counsel's leading questions, Godwin voiced a generalized awareness that hunters and young paramours from time to time parked along the Methodist Parkway without permission from the owners. He also mentioned there were reports in the past of criminal vandalism on certain areas of the Methodist Center's property. He added that the Town has a sewer facility located on the property.

In the landmark case of *Terry v. Ohio,* 392 U.S. 1, 8-9, 88 S.Ct. 1868, 1873 (1968) (emphasis added) the United States Supreme Court eloquently described the fundamental right embodied in the Fourth Amendment to the U.S. Constitution:

> The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *.' **This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs. For, as this Court has always recognized,**
>
> > "**No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of**

10

**others, unless by clear and unquestionable authority of law.**" *Union Pac. R. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 100.

And again most recently in *Heien v. North Carolina*, ____ U.S.____, 135

S.Ct. 530, 535-36 (2014) (bold emphasis added) the high court reiterated:

The Fourth Amendment provides:

> "**The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,** and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

A traffic stop for a suspected violation of law is a "seizure" of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment. *Brendlin v. California,* 551 U.S. 249, 255–259, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). All parties agree that to justify this type of seizure, officers need only "reasonable suspicion"—that is, "**a particularized and objective basis for suspecting the particular person stopped" of breaking the law**. *Prado Navarette v. California, 572 U.S. ——, ——, 134 S.Ct. 1683, 1687–88, 188 L.Ed.2d 680 (2014)* (internal quotation marks omitted) . . . .

As the text indicates and we have repeatedly affirmed, **"the ultimate touchstone of the Fourth Amendment is 'reasonableness.' "** *Riley v. California, 573 U.S. ——, ——, 134 S.Ct. 2473, 2482, 189 L.Ed.2d 430 (2014)* (some internal quotation marks omitted).

. . . .

Contrary to the suggestion of Heien and *amici,* our decision does not discourage officers from learning the law. The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable. We do not examine the subjective understanding of the particular officer involved. Cf. *Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)*. And the inquiry is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation. **Thus, an officer can gain no Fourth**

**Amendment advantage through a sloppy study of the laws he is duty-bound to enforce.**

In *U.S. v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008) (emphasis added), the

Fifth Circuit explained the requirements for a permissible investigatory stop as

follows:

> An investigative vehicle stop is permissible under *Terry* only when the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *United States v. Martinez, 486 F.3d 855, 861 (5th Cir.2007).* Although a "mere hunch" will not suffice, a "reasonable suspicion" need not rise to the level of probable cause. *United States v. Lopez–Moreno, 420 F.3d 420, 430 (5th Cir.2005).* To determine the propriety of such a stop, we "first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Brigham, 382 F.3d 500, 506 (5th Cir.2004) (en banc) (citing Terry, 392 U.S. at 19–20, 88 S.Ct. 1868).*

In *U.S. v. Arvizu*, 534 U.S. 266, 273-74, 122 S.Ct. 744,750-51 (2002), the

United States Supreme Court again reiterated:

> **The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.** *Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).* Because the "balance between the public interest and the individual's right to personal security," *United States v. Brignoni–Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975),* tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity " 'may be afoot,' " *United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)* (quoting *Terry, supra,* at 30, 88 S.Ct. 1868). See also *Cortez, 449 U.S., at 417, 101 S.Ct. 690* ("**An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity").**
>
> When discussing how reviewing courts should make reasonable-suspicion determinations, **we have said repeatedly** that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a **"particularized and objective**

**basis" for suspecting legal wrongdoing.** See, *e.g., id.,* at 417–418, 101 S.Ct. 690. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." *Id.,* at 418, 101 S.Ct. 690. See also *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers). **Although an officer's reliance on a mere " 'hunch' " is insufficient to justify a stop,** *Terry, supra,* at 27, 88 S.Ct. 1868, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard, *Sokolow, supra,* at 7, 109 S.Ct. 1581.

 In the trial court in the case before us Godwin testified as follows (emphasis added):

Q. What was the reason for your stopping her?

A. **The reason I stopped her is because the vehicle turned down Methodist Parkway about six (6:00) in the morning and it was still dark. And the Methodist Parkway is some buildings back there. Also, at that time there was a deputy and his family that lived back there. So I stopped her to see what – what was going on and why they was going back there.**

Q. It wasn't speeding?

A. No.

Q. It was just to check and see –

A. Why – that's a private property and we control that – control that property.[1]

---

[1] Louisiana Revised Statutes 14:63(F)(4) provides that an employee with permission to enter private property where they are employed is not committing a trespass by being on the property. "The following persons may enter or remain upon immovable property of another, unless specifically forbidden to do so by the owner or other person with authority, either orally or in writing: … (4) An employee of the owner, lessee or custodian of the immovable property while performing his duties, functions and responsibilities in the course and scope of his employment." La.R.S. 14:63(F)(4). Godwin had no right to stop Parker as her presence on private property was lawful. Godwin admitted he believed Parker was an employee reporting for work on this private property yet he proceeded to investigate her. No evidence was presented by the defense showing the officer had been authorized by the owner of the property to stop vehicles traveling on the private road or that the officer was retained by the owner to "control" traffic on the private roadway.

13

Q. Did you ask her where she was going?

A. Yes.

Q. What did she tell you?

A. She said she worked at Methodist apartment – Methodist Center.

Q. Okay. After she told you that, wasn't that enough for you just to let her go and that's the end of it?

A. No. No.

Q. Well, you said the reason why you stopped her was to see where she was going. Once she told you she was going to the Methodist Center, did she tell you what did she do at the Methodist Center?

A. **What she told me, she was going there they were cooking breakfast that morning, which at that time I understood because my wife used to work there and I knew they did go in early in the morning.**

Q. Okay. You stopped her to see where she was going. She told you she was going to the Methodist Center. Was she speeding?

A. No.

Q. Was she committing any moving violation?

A. No.

Q. **The only reason you stopped her was she was going to the Methodist Center and when you stopped she told you where she was going, were you satisfied with that?**

A. **I was satisfied with what she was doing but I was still going to do my job though.**

Q. Okay. Now, you knew the Methodist Center was back there because your wife worked there, right?

A. At one time yes.

14

Q. Okay.

A. And I patrol that all the time, too.

Q. **All right. Did you have any reason to doubt that's where she was going?**

A. **No.**

Q. **Okay. Why you didn't stop, end right there and just call it a day, why did you proceed further?**

A. **Because my job is to check to see if there's any warrants, see if there – if this person is wanted and there's other things that goes on besides just – just – I'm going to check and make sure everything is all right before I let her go, I do it for everybody.**

Q. Correct. But even though she told you she worked there, now- how long you had been working that highway at 6:05 in the morning?

A. I was on patrol and I just happened to turn down the road when this was happening, going down the same road that she was going.

. . . .

Q. **So let me see if I understand this. You saw her going to the Methodist Center. You activated your lights. She wasn't violating any laws. You just wanted to see who she was.**

A. **Right.**

. . . .

Q. Did she ask you why did you stop her?

A. I don't recall if she asked, I did tell her, but I don't remember –

Q. What did you tell her?

A. The best I can recall I asked her, I advised her that **I stopped her because they was turning down a private drive and I was just trying to find out what was going on.**

Q. You didn't say she looked suspicious?

A. No not that I recall.

15

As noted, the videotape introduced at trial presents a different picture than the one framed by Godwin. The video shows Godwin was following Parker for some distance on the public roadway before her signal light indicated she would be turning onto Methodist Parkway. This is consistent with Parker's testimony and the Mayor's testimony. This case is not res nova in Louisiana or anywhere in the United States. The particular legal issue presented here has long been resolved by the United States Supreme Court in an unbroken line of cases cited often in the well-settled jurisprudence of this State. The issue is simple: Can a police officer conduct an investigatory stop and detain citizens otherwise legally operating motor vehicles on the public highways or private roads in this State solely because past crimes or suspicious activities have occurred in the area where motorists are traveling? The answer is not even close: "No." There simply is no "check-em-out" exception to this Constitutional prohibition. In this case there were no exigencies, i.e. there was no terrorist on the loose, no amber alert, no recent criminal activity in the area, no recent jail-break, no report of a truck matching the description of the one driven by Parker as being involved in any criminal activity. Officer Godwin could articulate nothing to establish a particularized and objective basis for suspecting Parker of criminal activity.

Likewise, Defendant failed utterly in its attempt to justify Godwin's stop as one being performed in a high-crime area. Defendant produced absolutely no evidence whatsoever to even suggest that the area in which Parker was pulled over could be considered a high-crime area. According to the testimony elicited from Godwin by defense counsel, the criminal activity in this area consisted of young people parking down that road, hunters parking while hunting in the area, and

some sort of criminal mischief to property located in the area in the distant past. Although the courts have not developed a clear definition of what constitutes a "high-crime" area we can safely say that this area is not one. Moreover, even if this were a high-crime area, Defendant failed utterly to set forth any basis to conclude that Parker was engaging in or about to engage in any criminal activity.

Parker was not a trespasser on this private property. She was an employee reporting for work and authorized to travel on the private road. As Godwin candidly admitted in Plaintiff's initial cross-examination of him, he merely stopped Parker because he wanted to see who she was and find out why she was going down that roadway. He further testified once he observed Parker and her passengers in their work attire, and she explained they were on their way to work in the Methodist facility, he believed her but was still intent on seeing if he could find out anything untoward concerning Parker or her passengers. Godwin does not even articulate that something caused him to have a "hunch" that Parker was engaged in or about to engage in criminal activity. In fact, he denied he told Parker she or her vehicle looked suspicious. Moreover, as to connecting Parker to a known crime area, the video clearly shows Godwin began following Parker before she approached the area where he stopped her and before she made any indication that she intended to turn on the private roadway. Godwin no doubt sincerely believed he, as a police officer for the Town of Woodworth, had the right to stop Parker just to see who she was and where she was going, i.e. to conduct a "check-em-out" stop. Godwin's "good faith" misunderstanding of the limit of his police authority does not ipso render his action reasonable under the circumstances.

17

As the high court explained in *Terry*, " '[S]imple good faith on the part of the arresting officer is not enough.' If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers and effects,' only in the discretion of the police." *Terry*, 392 U.S. at 22. As the United States Supreme Court made clear in *Terry* "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to [the officer's] inchoate and unparticularized suspicion or 'hunch', but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* at 27. Objective reasonableness is to be based on "specific and articulable facts which, taken together with reasonable inferences from those facts, reasonably warrant [an] intrusion." *Id.* at 21. Absent a traffic violation, so far as can be gleaned from this record, the only visible attribute of Parker and her passengers that might have distinguished them from other motorists turning on Methodist Parkway was they are all African Americans. There simply is no other distinguishing thing that can be surmised. It is well-established law that racial profiling is completely incompatible with the Constitutional protections of the Fourth Amendment and our own State Constitutional right to privacy.

More to the point, even if the area was shown to be a high-crime area, Parker's presence in such an area, standing alone, is not sufficient to establish a reasonable belief that she was engaging in or about to engage in some criminal activity. In *Brown v. Texas*, 443 U.S. 47, 50-52, 99 S.Ct. 2637, 2640 (1979) (emphasis added)(alteration in original) the United States Supreme Court held:

> **When the officers detained appellant for the purpose of requiring him to identify himself, they performed a seizure of his**

18

**person subject to the requirements of the Fourth Amendment.** In convicting appellant, the County Court necessarily found as a matter of fact that the officers "lawfully stopped" appellant. See Tex.Penal Code Ann., Tit. 8, § 38.02 (1974). The Fourth Amendment, of course, "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest. *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). " '[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person,' *id.*, at 16, 88 S.Ct., at 1877, and the Fourth Amendment requires that the seizure be 'reasonable.' " *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975).

The reasonableness of seizures that are less intrusive than a traditional arrest, see *Dunaway v. New York*, 442 U.S. 200, 209–210, 99 S.Ct. 2248, 2254–2255, 60 L.Ed.2d 824 (1979); *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968), depends " 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977); *United States v. Brignoni-Ponce, supra*, 422 U.S., at 878, 95 S.Ct., at 2578. Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. See, *e. g.*, 422 U.S., at 878–883, 95 S.Ct., at 2578–2581.

**A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field**. See *Delaware v. Prouse*, 440 U.S. 648, 654–655, 99 S.Ct. 1391, 1396–1397, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce, supra*, 422 U.S., at 882, 95 S.Ct., at 2580. **To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.** *Delaware v. Prouse, supra*, at 663, 99 S.Ct., at 1401. See *United States v. Martinez-Fuerte*, 428 U.S. 543, 558–562, 96 S.Ct. 3074, 3083–3085, 49 L.Ed.2d 1116 (1976).

The State does not contend that appellant was stopped pursuant to a practice embodying neutral criteria, but rather maintains that the officers were justified in stopping appellant because they had a "reasonable, articulable suspicion that a crime had just been, was

19

being, or was about to be committed." We have recognized that in some circumstances an officer may detain a suspect briefly for questioning although he does not have "probable cause" to believe that the suspect is involved in criminal activity, as is required for a traditional arrest. *United States v. Brignoni-Ponce, supra*, 422 U.S., at 880–881, 95 S.Ct., at 2580. See *Terry v. Ohio, supra*, 392 U.S., at 25–26, 88 S.Ct., at 1882. However**, we have required the officers to have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity**. *Delaware v. Prouse, supra*, at 663, 99 S.Ct., at 1401; *United States v. Brignoni-Ponce, supra* 422 U.S., at 882–883, 95 S.Ct., at 2581; see also *Lanzetta v. New Jersey*, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939).

**The flaw in the State's case is that none of the circumstances preceding the officers' detention of appellant justified a reasonable suspicion that he was involved in criminal conduct**. Officer Venegas testified at appellant's trial that the situation in the alley "looked suspicious," but he was unable to point to any facts supporting that conclusion. There is no indication in the record that it was unusual for people to be in the alley. The fact that appellant was in a neighborhood frequented by drug users, **standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct.** In short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood. When pressed, **Officer Venegas acknowledged that the only reason he stopped appellant was to ascertain his identity**. The record suggests an understandable desire to assert a police presence; however, that purpose does not negate Fourth Amendment guarantees.

Likewise in this case, Officer Godwin acknowledged his only reason for stopping Parker was to find out who she was and where she was going. Parker's reasonable expectation of privacy, her reasonable expectation to be left alone while she proceeded to work at the Methodist Center, as she had done every day for over three years, was not subject to Godwin's arbitrary invasion solely at his unfettered discretion. Parker's activity, i.e. her presence on Methodist Parkway before daylight, was no different than the presence of any motorist, including the motorist who passed right beside Godwin without him making any attempt to make a "check-em-out" stop of that vehicle.

In *State v. Sims*, 02-2208, p. 4-5 (La. 6/27/08), 851 So.2d 1039, 1043, the Louisiana State Supreme Court set forth the standard for investigatory stops under the Louisiana and federal constitution:

> While an arrest requires officers to have probable cause to believe that a suspect has committed a crime, *see* U.S. Const. amend. IV and La. Const. art. I, § 5, an investigatory stop requires a lesser standard of "reasonable suspicion." *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In Louisiana, the investigatory "*Terry*" stop is codified in La.Code Crim. Proc. Art. 215.1(A): "A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions." Like an arrest, an investigatory stop entails a complete restriction of movement, although for a shorter period of time. *State v. Bailey,* 410 So.2d 1123, 1125 (La.1982).
>
> **In making a brief investigatory stop, the police "must have <u>a particularized and objective basis for suspecting the particular person stopped of criminal activity</u>."** *State v. Kalie,* 96–2650, p. 3 (La.9/19/97), 699 So.2d 879, 881 (quoting *United States v. Cortez,* 449 U.S. 411, 417–418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). **Specifically, our courts have interpreted article 215.1 to require that an officer point to specific and articulable facts to justify an investigatory stop.** *State v. Huntley,* 97–0965, p. 3 (La.3/13/98), 708 So.2d 1048, 1049.

Louisiana Constitution Article 1, § 5 provides:

> Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.

Louisiana Code of Criminal Procedure Article 215.1(A) provides:

> A. A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.

21

B. When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably suspects the person possesses a dangerous weapon, he may search the person.

C. If the law enforcement officer finds a dangerous weapon, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.

D. During detention of an alleged violator of any provision of the motor vehicle laws of this state, an officer may not detain a motorist for a period of time longer than reasonably necessary to complete the investigation of the violation and issuance of a citation for the violation, absent reasonable suspicion of additional criminal activity. However, nothing herein shall prohibit a peace officer from compelling or instructing the motorist to comply with administrative or other legal requirements of Title 32 or Title 47 of the Louisiana Revised Statutes of 1950.

It is Defendants' burden to prove there was an objective justification for the infringement of Parker's constitutional expectation of privacy. *Terry*, 391 U.S. 1. Godwin boldly admitted in his trial testimony, despite believing Parker's explanation for turning onto Methodist Parkway, he still felt he had the right to further detain her and proceed: "[T]o check to see if there's any warrants, see if there – if this person is wanted and there's other things that goes on besides just – just – I'm going to check and make sure everything is all right before I let her go, I do it for everybody." Godwin has no right to infringe upon the privacy of the citizenry he serves absent the existence of the conditions set forth in La.Code Crim.P. art. 215.1(A), or the jurisprudentially-created requirement that he have an articulable reasonable basis to believe that a crime has been or is about to be committed. In the words of plaintiff's counsel, Mr. Edward Larvadain, Jr. "In other words, these police officers have been habitually violating the rights of individuals passing through the Town of Woodworth by illegally violating their

22

constitutional rights against illegal search and seizure . . . . These officers have been doing wrong so long, they have begun to believe that wrong is right." We could not say it better. Officer Godwin's testimony demonstrates that he genuinely believes he has a right to make these "check-em-out stops" and that this is normal procedure for the police officers of the Town of Woodworth. Godwin's testimony shows a complete lack of knowledge of the restraints imposed upon police conduct by the U.S. Constitution and the laws and Constitution of the State of Louisiana. **To be clear, these sort of "check-em-out" stops are forbidden and are repugnant to our federal and state constitutional right to privacy, and, "[w]hen such conduct is identified, it must be condemned by the judiciary."** *Terry* 392 U.S. at 15 (emphasis added). Our courts "retain their traditional responsibility to guard against police conduct which is over-bearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires." *Id.* To put it plainly, this behavior does not pass the smell test, i.e. "it stinks." We therefore agree with the trial court's finding that the stop was completely unlawful and thus "everything else falls." This assignment of error is completely without merit.

**Vicarious Liability**

In its third assignment of error, Defendant asserts the trial court erred in awarding damages against the Town of Woodworth without a specific finding that Godwin was liable to Parker for his actions while on duty as a police officer. Defendant asserts that without a specific finding that Godwin is at fault his employer cannot be held vicariously liable. First, we note the trial court did not assign oral or written reasons for its judgment. At the close of trial the trial court succinctly stated: "The court finds that there was insufficient evidence to effectuate

23

a stop to begin with, and with that, everything falls, all tickets that were issued fall." The trial court later signed a judgment against "defendants, TOWN OF WOODWORTH, for general damages for all of plaintiff's psychological suffering in the sum of THIRTY THOUSAND AND NO/100 ($30,000.00) DOLLARS, together with legal interest from date of judicial demand until paid in full." The trial court also awarded Parker a reimbursement of $193.61 for the towing fee, a reimbursement of $215.00 for the fine Parker paid Woodworth, as well as all court costs against the Town of Woodworth.

Parker's suit alleged, at all times pertinent to Parker's claims, Godwin was acting within the course and scope of his employment as a police officer for the Town of Woodworth. The suit alleged the Town of Woodworth is vicariously liable to Parker because of the actions of its employee, Godwin. A review of the record discloses that both Godwin and the Mayor of Woodworth admit that when Godwin stopped Parker he was acting in his capacity as a police officer for the Town of Woodworth. Both also testified that the stop was made within the jurisdiction of the Town of Woodworth. Defendant offered nothing to the contrary; and, under both direct and cross-examination, Defendant's own witnesses establish Godwin was an employee of the Town of Woodworth acting in the course and scope of his employment at the time he stopped Parker, issued her citations, and had the vehicle she was driving towed.

In *Brasseaux v. Town of Mamou*, 99-1584 (La. 1/19/00), 752 So.2d 815, the Louisiana State Supreme Court discussed the theory of an employer's vicarious liability under Louisiana law and jurisprudence. In *Brasseaux*, the plaintiff alleged the Town of Mamou was vicariously liable for the acts of its employee, an off-duty police officer. The supreme court explained:

Generally referenced as the doctrine of *respondeat superior,* the body of Louisiana law related to the imposition of liability on the master for the delicts of the servant is codified in LA. CIV. CODE art. 2320. Therein, it is stated: "Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." Although an employment relationship may in fact exist, the employer will not be liable for the substandard conduct of the employee unless the latter can be fairly said to be within the course and scope of the employment with the former. *Russell v. Noullet,* 98-0816 (La.12/1/98), 721 So.2d 868; *Baumeister v. Plunkett,* 95-2270 (La.5/21/96), 673 So.2d 994.

In *LeBrane v. Lewis,* 292 So.2d 216 (La.1974), we set forth the requisite considerations for determining whether the tortious conduct of the employee may be properly imputed to the employer. There, we stated that the employer's liability is predicated on whether the tortious conduct of the employee is "so closely connected in time, place, and causation to his employment-related duties as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct instituted by purely personal considerations entirely extraneous to the employer's interests." *Id.* at 218. Because of the unlimited contexts in which the issue may arise, we have stated that an employee's conduct is generally within the course and scope of his employment if the conduct is of the character and nature that he is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer. *Orgeron on Behalf of Orgeron v. McDonald,* 93-1353 (La.7/5/94), 639 So.2d 224, 226-227, *citing* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 70 (5 th ed.1984).

As a mixed question of fact and law, the determination by the trial court as to whether an employee's conduct was sufficiently employment-related, such that it may be imputed to the employer, should be accorded great deference by a reviewing court under the manifest error standard of review. *Ermert v. Hartford Ins.Co.,* 559 So.2d 467, 478 (La.1990); *Baumeister,* 673 So.2d at 998. Upon review, an appellate tribunal may reverse a lower court's factual findings only when (1) the record reflects that a reasonable factual basis does not exist for the finding of the trial court, and (2) the record reflects that the finding is clearly wrong. *Stobart v. State, Through Dept. of Transp. and Dev.,* 617 So.2d 880, 882 (La.1993). However, we are cognizant of the fact that we must do more than merely review the record for *some* evidence that supports the lower court's finding. *Id.* Rather, we are obligated to review the entire record before us and determine whether it contains sufficient evidence from which a rational trier of fact could conclude that the conduct complained of was employment-related. *Stobart,* 617 So.2d at 882; *Russell,* 721 So.2d at 871.

25

*Id.*

In *Smith v. Lafayette Parish Sheriff's Department*, 03-517, pp. 8-9 (La.App. 3 Cir. 4/21/04), 874 So.2d 863, 868-69, *writ denied*, 04-1886 (La. 10/29/04), 885 So.2d 595, this court addressed a plaintiff's burden of proof in a negligence action brought against a police officer for actions while in the course and scope of his employment with a city police department:

> To prevail on a negligence claim under La.Civ.Code art. 2315, the plaintiff must prove by a preponderance of the evidence that: (1) defendant had a duty to conform his conduct to a specific standard (duty); (2) defendant failed to conform his conduct to the appropriate standard (breach of duty); (3) defendant's conduct was the cause-in-fact of plaintiff's injuries (cause-in-fact); (4) defendant's conduct was a legal cause of plaintiff's injuries (the risk and harm caused to plaintiff was within the scope of the protection afforded by the duty); and (5) plaintiff incurred actual damages (damages). *Theriot v. Lasseigne,* 93–2661 (La.7/5/94); 640 So.2d 1305; *Faucheaux v. Terrebonne Consolidated Government,* 615 So.2d 289 (La.1993); *Roberts v. Benoit,* 605 So.2d 1032 (La.1991); *Fowler v. Roberts,* 556 So.2d 1 (La.1989). A negative answer to any of the above inquiries will result in the determination of no liability. *Mathieu v. Imperial Toy Corp.,* 94–0952 (La.11/30/94); 646 So.2d 318.
>
> *Gray v. Economy Fire & Cas. Ins. Co.,* 96–667, pp. 6–7 (La.App. 3 Cir. 11/6/96), 682 So.2d 966, 970 (footnote omitted).

> "Whether a duty is owed is a question of law." *Hardy v. Bowie,* 98–2821, p. 12 (La.9/8/99), 744 So.2d 606, 614. Duties are often imposed on governmental agencies as a result of the services they perform, and a breach of such a duty may result in the imposition of liability for damages that result from that breach. *Id.* "The determination of whether a particular duty should be imposed on a particular governmental agency is a policy question." *Id.*

> Generally, a "police officer has a duty to perform his function with due regard for the safety of all citizens who will be affected by his action." *Prattini v. Whorton, 326 So.2d 576 (La.App. 4th Cir.1976)*; *Justin v. City of New Orleans Through Morial, 499 So.2d 629, 631 (La.App. 4th Cir.1986)*, *writ denied, 501 So.2d 232 (La.1987)*. "His authority must at all times be exercised in a reasonable fashion and he must act as a reasonably prudent man under the circumstances." *Id.* Officers are held to choosing a course of action which is reasonable under the circumstances. *Mathieu, supra* at 325.

We find no manifest error in the trial court's determination that the Town of Woodworth is vicariously liable in damages to Parker for the actions of its employee, Officer Godwin. Nothing in the law requires the trial court to articulate a specific finding as to Officer Godwin in order to hold his employer liable. The basis of the Town of Woodworth's liability as Godwin's employer is clearly established in the record. Plaintiff based her claim against the Town of Woodworth on the allegation that Godwin at all times pertinent acted within the course and scope of his employment as a police officer for the Town. The trial court's judgment against the Town of Woodworth reflects the trial court's factual finding that Parker established the Town's vicarious liability making it the party responsible to pay damages to Parker for Godwin's negligence, which caused the improper collection of fines by the Town, the improper imprisonment of Parker, and the towing charges incurred by Parker. Additionally, La.R.S. 42:1441.3 provides in pertinent part:

> A. The master of an individual who is an elected or appointed public officer, official, or employee of a political subdivision, under the meaning and purpose of Civil Code Article 2320 and other laws imposing liability on a master for the offenses and quasi offenses of his servant, is the particular political subdivision of which such individual is a public officer, official, or employee.

> B. Determinants of which political subdivision may be made liable as master for the offenses and quasi offenses of a public officer

27

of a political subdivision under Civil Code Article 2320 and other laws imposing such master-servant liability, shall include:

(1) The territorial jurisdiction and territorial extent of the governmental body politic comprising the electorate who usually elects such public officer, if he is elected, or who usually elects the public officer who appoints such public officer, if he is appointed as an assistant, deputy, or other representative or designee of an elected public officer, and comprising the electorate whom such public officer primarily serves; if the office which the public officer holds is in the nature of a representative capacity on a multi-member board, council, commission, jury, or other multi-member body which acts as a whole, then the territorial jurisdiction and territorial extent of such multi-member board on which such public officer serves;

(2) The source of the funds used for the operating expenses of the office in which such public officer serves; and

(3) Unless such public officer is elected directly by the electorate of the political subdivision of which he is such officer, the office of the individual who has the right to control closely the daily time and physical activities of such public officer in carrying out his public duties.

C. Determinants of which political subdivision may be made liable as master for the offenses and quasi offenses of a public employee of a political subdivision under Civil Code Article 2320 and other laws imposing such master-servant liability and for finding an employer-employee relationship, shall include all of the following:

(1) The public officer or governmental body politic that exercises the power of selection and engagement of the public employee.

(2) The public officer or governmental body politic that supervises or has the right to control closely the daily time and physical activities of such public employee in carrying out his public duties.

(3) The public officer or governmental body politic that exercises the power of disciplinary actions and dismissal of the public employee.

(4) The source of the funds used for the payment of salaries or wages of the public employee.

D. As provided in R.S. 42:1, the term "public officer" includes anyone who holds any elective or appointive office created by constitution or law. The term is not synonymous with "state officer",

as "public officer" includes not only public officers of the state but also public officers of parishes, municipalities, special districts, and other political subdivisions. While all offices created by the constitution or law are "public offices", they are not all "state offices", as they include parish offices, municipal offices, district offices, and offices of political subdivisions. A public officer may be the officer of a parish, municipality, district, or other political subdivision without being appointed by or under the direct control of the particular body which exercises the legislative functions of such parish, municipality, district, or political subdivision, in much the same manner as a public officer of the state may hold an office in the executive branch or may hold the office of a state court judgeship without being appointed by or under the direct control of the legislature.

E. As provided in R.S. 42:62, the term "political subdivision" means a parish, municipality, and any other unit of local government, including a school board and a special district, authorized by law to perform governmental functions; in addition, for the purposes of this Part, mayor's courts, justice of the peace courts, district attorneys, sheriffs, clerks of court, coroners, tax assessors, registrars of voters, and all other elected parochial officials shall be separate political subdivisions. The terms "state" and "state agency" mean the executive branch, the legislative branch, and the judicial branch of state government, or the parts thereof, as defined in R.S. 42:62.

We further note Parker had no hearing concerning the charges against her and no real record was made for review save a one-page document which this court previously ruled, and the trial of this matter fully demonstrated, was signed by Parker as a blank form later filled in by the Mayor's designee. This form oddly purports to have Parker enter a guilty plea to an offense which was dismissed, i.e. the charge of no registration. The charge of driving with no insurance, a charge which ultimately led to Parker's unlawful arrest and imprisonment, was legally unsupportable, to put it kindly. This State's insurance laws include mandatory requirements that any motor vehicle liability insurance policy issued in this State *must include coverage of a permissive driver.* The evidence indisputably shows Parker was a permissive, validly licensed, driver covered under the owner of the vehicle's policy. The "hallway" administration of justice she experienced seems a

29

far cry from the sort of due process guaranteed to all citizens under both the State and federal Constitutions. Parker's imprisonment for twenty five days not only offends our notions of due process of law, equal access to our courts of justice, and every citizen's fundamental constitutional right to be free from unreasonable restraints on his or her liberty, it cannot be excused because this is the way "business" is done in the Town of Woodworth. Woodworth is unquestionably liable to Parker for the damages awarded by the trial court.

**Immunity Defense**

Defendant also asserts in the alternative, that the trial court erred in failing to find Officer Godwin is entitled to immunity. We disagree. In *Hebert v. Adcock*, 10-887 (La.App. 3 Cir. 2/2/11), 55 So.3d 1007, *writ denied* 11-477 (La. 4/25/11), 62 So.3d 92, we addressed the issue of police officers' immunity from liability under La.R.S. 9:2798.1. In *Hebert* the plaintiff sued the City of New Iberia and two police officers employed by the city for personal injuries suffered by Hebert when two New Iberia city police officers entered his home to execute a search warrant unlawfully obtained. Relying on our prior decision in *Saine v. City of Scott,* 02-265, p.5 (La.App. 3 Cir. 6/12/02), 819 So.2d 496, 500 we held:

> ["Louisiana Revised Statutes] 9:2798.1 does not protect against legal fault or *negligent conduct* at the operational level, but confers immunity for policy decisions; i.e. decisions based on social, economic, or political concerns." *Chaney v. Nat. R.R. Passenger Corp.*, 583 So.2d 926, 929 (La.App. 1 Cir. 1991) (emphasis added): *Ducote* [*v. City of Alexandria*, 95-1269 (La.App. 3 Cir. 7/17/96),] 677 So.2d 1118. Thus, "[t]he exception protects the government from liability only at the policy making or ministerial level, *not at the operational level.*" *Fowler v. Roberts*, 556 So.2d 1, 15 (La. 1989), on *rehearing; see also Rick v. State Dept. of Transp. and Dev.*, 93-1776, (La.1/14/94); 630 So.2d 1271, rehearing denied, (holding that "[d]ecisions at an operational level can be discretionary if based on policy"). Determining

whether the Fowler-exception applies requires a two-step inquiry.

First, a court must determine whether the action is a matter of choice. If no options are involved, the exception does not apply. If the option involves selection among alternatives, the court must determine whether the choice was policy based.

*Rick*, 630 So.2d at 1276.

. . . .

. . . . The trial court also found that the decision, or choice, to gain entry into Mr. Hebert's home by kicking down the door was made unilaterally by Officer Davis. We find no manifest error in the trial court's conclusion that there was no justifiable basis for a no-knock entry into Mr. Hebert's home; therefore, the conduct of Officer Davis in entering Mr. Hebert's home and his subsequent "protective sweep" of Mr. Hebert's home is not immune from liability under La.R.S. 9:2798.1 because that statute does not protect against legal fault or negligent conduct at the operational level. Officer Davis' failure to give Mr. Hebert sufficient time to answer the door constitutes negligence that caused Mr. Hebert's injuries, thereby entitling him to damages for the destruction of his property and damages for his personal injury and mental distress. Accordingly, we affirm the trial court's finding of negligence against Officer Davis as it pertains to his negligent entry into Mr. Hebert's home.

*Hebert,* 55 So.3d at 1013-14. (alterations in original)

Hebert was awarded $40,000.00 in general damages but this court was not called upon to consider the reasonableness of that award.

In the present case the record supports the trial court's finding that Godwin made an improper investigatory stop. As we have noted above, even Godwin admits he stopped Parker's vehicle only because he desired to see who she was and ask where she was going. This assignment of error is totally without merit.

31

**Damages Award and Costs**

Lastly, Defendant asserts the amount of damages awarded is excessive. This assignment is wholly without merit. The trial judge has vast discretion in its award of damages:

> It is well-settled that vast discretion is accorded to the trier of fact in fixing general damage awards. La.Civ.Code art. 2324.1; *Howard v. Union Carbide Corp.,* 09–2750 (La.10/19/10), 50 So.3d 1251. This vast discretion is such that an appellate court should rarely disturb an award of general damages. Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. *Youn v. Maritime Overseas Corp.,* 623 So.2d 1257 (La.1993), *cert. denied,* 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). "An appellate court may not overturn an award for damages unless it is so out of proportion to the injury complained of that it shocks the conscience." *Harrington v. Wilson,* 08–544, p. 16 (La.App. 5 Cir. 1/13/09), 8 So.3d 30, 40.

*Smith v. Guidroz*, 12-1232, p. 15 (La.App. 3 Cir. 10/30/13), 125 So.3d 1268, 1278, *writ denied*, 13-2757 (La. 2/14/14), 132 So.3d 962.

In *Stelly v. Zurich American Insurance Company*, 11-1144 pp. 3-4 (La.App. 3 Cir. 2/1/12), 83 So.3d 1225, 1228 (emphasis added) we set forth the standard for an appellate court's review of general damage awards:

> The Louisiana Supreme Court articulated the standard of review for general damage awards in *Duncan v. Kansas City Southern Railway Co.,* 00–66 (La.10/30/00), 773 So.2d 670, *cert. denied,* 532 U.S. 992, 121 S.Ct. 1651, 149 L.Ed.2d 508 (2001), as follows:
>
>> **General damages are those which may not be fixed with pecuniary exactitude; instead, they "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms**." *Keeth v. Dept. of Pub. Safety & Transp.,* 618 So.2d 1154, 1160 (La.App. 2 Cir.1993). **Vast discretion is accorded the trier of fact in fixing general damage awards**. La. Civ.Code art. 2324.1; *Hollenbeck v. Oceaneering Int., Inc.,* 96–0377, p. 13 (La.App. 1 Cir. 11/8/96); 685 So.2d 163, 172. This vast discretion is such

that an appellate court should rarely disturb an award of general damages. *Youn v. Maritime Overseas Corp.,* 623 So.2d 1257, 1261 (La.1993), *cert. denied,* 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. *Youn,* 623 So.2d at 1260. As we explained in *Youn:*

> Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award.

*Id.* at 1261.

> The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. *Cone v. National Emergency Serv. Inc.,* 99–0934 (La.10/29/99), 747 So.2d 1085, 1089; *Reck v. Stevens,* 373 So.2d 498 (La.1979). Only after a determination that the trier of fact has abused its "much discretion" is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. *Coco v. Winston Indus., Inc.,* 341 So.2d 332 (La.1976).

*Duncan,* 773 So.2d at 682–83.

We have chronicled above the nightmare Parker must have experienced as she struggled to stop her unlawful detention and ultimate incarceration. The mental anguish she must have endured while incarcerated for twenty five (25) days and nights cannot be explained away or left uncompensated. Additionally, Parker left her employment with the Methodist Center, where she had been employed for over three years, because she lived in fear that any time she passed through the Town of Woodworth on her way to work she would again be subjected to the same

33

kind of unlawful treatment she endured in this case which might also lead to her unlawful imprisonment again. It is difficult to calculate a just amount of damages which would fully compensate a victim such as Parker for the losses and indignities she suffered in this case. Just her unlawful imprisonment for twenty five days renders the small sum awarded Parker anything but excessive. Parker testified without contradiction that from the moment of the improper stop and detention and towing of the vehicle she was driving, to her arrest at her home in the presence of her children, to her unlawful incarceration for twenty five days, she suffered great mental distress. We find no abuse of discretion in the trial court's award of damages.

We do, however, find merit in Defendant's contention regarding the trial court's failure to state a specific amount of court costs which the Town of Woodworth must pay. We remand the case solely for the purpose of the trial court to set the exact amount of court costs in the trial court to be paid by the Town of Woodworth in accordance with the requirement of La.R.S. 13:5112. In all other respects the judgment of the trial court is affirmed. All costs of this appeal incurred in this court are assessed against the Town of Woodworth in the amount of $1,196.00 (One thousand one hundred ninety-six dollars and zero cents).

**AFFIRMED. REMANDED WITH INSTRUCTIONS**.